UNITED STATES of America,
Plaintiff–Appellee,

v.

Ben Farrell KIRK,
Defendant–Appellant.

No. 86–1383.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1988.

Decided April 14, 1988.

Leslie E. Osborne, Jr., Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Ray A. Findlay, Kailua–Kona, Hawaii, for defendant-appellant.

Before GOODWIN, FARRIS and NELSON, Circuit Judges.

PER CURIAM:

Ben Farrell Kirk appeals from his conviction on one count of conspiracy, one count of RICO, fifty-six counts of mail fraud, three counts of wire fraud, and two counts of interstate transportation of stolen property. Kirk contends that his conviction should be reversed because (1) the denial of certain trial transcripts violated his right to prepare an adequate defense; (2) the admission of certain testimony violated the hearsay prohibition and his right to confront the witnesses against him; and (3) the government failed to prove sufficiently the RICO charge. The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the conviction on all counts.

## FACTUAL AND PROCEDURAL BACKGROUND

W.P.M.K., a company founded by Kirk and three others in 1979, provided condominiums and apartments for purchase through a "right-to-use" time share club. Members purchased the right to use club condominiums, primarily in Hawaii, for a specified number of weeks. Kirk ran the day-to-day operations while the other three original founders financed the scheme. Because of financial difficulties, Kirk hired James Quincy in 1980 to handle marketing operations. W.P.M.K. acquired the facilities while Quincy's organization serviced the purchasers and maintained the facilities. Quincy contracted to receive 50% of the net sale proceeds of the venture. This arrangement operated until Quincy signed a termination agreement in May of 1981.

W.P.M.K. went into bankruptcy in late 1981.

The indictment charged Kirk and nine others with conspiracy to defraud in connection with the time share venture. Two of the ten originally indicted pled guilty and testified for the government. Evidence supports the conclusion that the group was "overselling" time share contracts—e.g., selling consumers eight-year, monthly contracts while only having three-year lease or purchase agreements for the facilities, and obligating the venture to provide 5,270 weeks of use when an inventory of only 3,068 weeks was acquired.

Testimony reveals that misrepresentations were made in the sale of time share purchase contracts. Testimony shows that W.P.M.K. had financial difficulties and the inventory was oversold even before Quincy was part of the venture. Kirk's control over the time share scheme even during Quincy's involvement is supported by testimony. One potential financier for the venture, Walter Gribben, testified that Kirk knew of Quincy's prior problems in such ventures and was warned that the agreement with Quincy would increase W.P.M.K.'s financial difficulties. The financing negotiations with Gribben fell through when Kirk insisted on hiring Quincy for 50% of the sales proceeds. Kirk presented evidence about problems between him and Quincy in 1981 due to purchaser dissatisfaction, and evidence that he insisted on full disclosure to prospective purchasers and quick processing of credit memos.

The first trial began for the remaining eight defendants on March 11, 1986 in Hawaii before the Honorable Jesse W. Curtis ("Trial # 1"). After two weeks, the court granted the severance motion of Appellant and two other co-defendants, Mary Anne Kirk and Gabriel LaBruzza. At a separate trial before Judge Curtis in April of 1986, Mary Anne Kirk and Gabriel LaBruzza were acquitted. The jurors were deadlocked as to Appellant's culpability and a mistrial was declared ("Trial # 2"). The third trial for Appellant commenced September 30, 1986 before the Honorable Edward Rafeedie. This eight-day jury trial

resulted in Kirk's conviction ("Trial # 3"). Kirk timely appealed.

## DISCUSSION

### I. *KIRK'S TRANSCRIPT REQUESTS*

■ We review a claim that the denial of a transcript request violated a defendant's constitutional right to prepare an adequate defense de novo. *See United States v. McConney*, 728 F.2d 1195, 1202–04 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We will not reverse the conviction if the denial was harmless beyond a reasonable doubt. *United States v. Rosales–Lopez*, 617 F.2d 1349, 1355 (9th Cir.1980) *aff'd*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

■ Kirk contends that the denial of certain transcript requests violated his right to prepare an adequate defense. Kirk requested the full transcripts from (1) Trial # 1—from which he had been severed; (2) Trial # 2—which resulted in a hung jury; and (3) the ongoing trial of James Quincy, a third party charged in the same scheme. The district court granted in part and denied in part the request for Trial # 1 transcripts; granted the request for Trial # 2 transcripts in full; and denied the request for transcripts of Quincy's trial. Kirk contends that the district court erred in not fully granting all three requests.

The Supreme Court has held that a state "must, as a matter of equal protection, provide indigent prisoners with the *basic tools of an adequate defense* or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971) (emphasis added). However, the right to free transcripts is not absolute. The Court in *Britt* recognized that the "outer limits of that principle are not clear." *Id.*

Kirk maintains that all the transcripts were essential to his defense preparation to refresh witnesses' memories, for impeachment purposes, and because he was presenting a different defense at his third trial. In *Britt*, the Supreme Court highlighted two factors to consider in determining an indigent defendant's need for transcripts: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." *Id.*

This court considered the denial of a request for transcripts of a preliminary hearing in *United States v. Rosales–Lopez*, 617 F.2d 1349 (9th Cir.1980). We noted that if a mistrial has occurred, "courts have generally regarded a transcript of the prior trial as a tool 'reasonably necessary' to an effective defense." *Id.* at 1355. Kirk's request for transcripts from his mistrial was granted in full. In *Rosales–Lopez*, this court held that the denial of the defendant's request for a transcript of his suppression hearing was harmless beyond a reasonable doubt. The defendant in *Rosales–Lopez* requested the testimony of two Immigration and Naturalization Service agents at the suppression hearing for impeachment purposes. This court ruled that no harm resulted from the denial of the transcript because of the "overall strong consistency" in the lengthy testimony of the two agents at the suppression hearing and the trial. *Id.* at 1356.

In the only other case addressing the right to free transcripts, this court upheld the denial of a defendant's request for transcripts of a *third party's* trial. *United States v. Bamberger*, 482 F.2d 166 (9th Cir.), *cert. denied*, 414 U.S. 1041, 94 S.Ct. 543, 38 L.Ed.2d 332 (1973). We noted that defining the scope of a defendant's "constitutional right to a free transcript of testimony at a third party's trial ... would require a delineation of those outer limits [declared uncertain by the Supreme Court]." 482 F.2d at 168. In *Bamberger*, this court held that the defendant could effectively cross examine the government's primary witness and that the denial was harmless because other evidence of the defendant's guilt significantly decreased the government's reliance on that witness. *Id.* at 168–69.

As in *Bamberger*, we need not reach the delineation of Kirk's constitutional right to

a free transcript because the denial of Kirk's requests for transcripts was harmless beyond a reasonable doubt. *See id.* at 168. The denial was harmless for two reasons. First, overwhelming evidence supports the conviction. Second, after reviewing the transcripts requested by Kirk, it is clear that Kirk was denied no material in this case that would have permitted him to refute the evidence against him.

As in *Bamberger,* other circumstantial evidence of guilt introduced against the defendant supports a determination of harmlessness. *See id.* at 169–70 & n. 7. Evidence such as Kirk's correspondence, tapes of his conversations and business meetings, and the time share purchaser sales materials significantly decreased the government's dependence on the credibility of witnesses.

Further, we have found no discrepancy in witness testimony between the trials. *See Rosales–Lopez,* 617 F.2d at 1356 (trivial inconsistencies in testimony will not merit reversal). In reviewing the record, we found only two minor witnesses from Kirk's final trial who had not appeared at his mistrial. The two witnesses offered testimony corroborating that of other consumers who complained about the time share venture.

## II. *HEARSAY TESTIMONY*

■ We review a district court's ruling to admit evidence over a hearsay objection for abuse of discretion. *United States v. Cowley,* 720 F.2d 1037, 1040 (9th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984).

■ Kirk contends that the district court erred in admitting hearsay testimony of time share contract purchasers, Paradise Palms salespeople, and co-defendants. However, these statements were admissible as nonhearsay statements of agents or employees under Fed.R.Evid. 801(d)(2)(D). Many of the statements cited by Kirk as instances of hearsay were made by agents or employees of Paradise Palms. The statements primarily described the nature and quality of the time share units, and the nature and extent of contractual obli-

gations to prospective time share customers, therefore clearly falling within the scope of agency or employment.

More importantly, the statements Kirk objects to are not hearsay at all. *See* Fed. R.Evid. 801(c). These statements are not offered for the truth of the matter asserted, but were admitted to establish that the statement was made or to demonstrate the effect the statement had on the hearer. *United States v. Anfield,* 539 F.2d 674, 678 (9th Cir.1976). For example, statements of salespersons misrepresenting the program were admissible to prove that the misrepresentations were made, not to prove the truth of what the salespersons stated. Because the admitted statements were non-hearsay admissions pursuant to Fed.R. Evid. 801(d)(2)(D) and were not hearsay, the district court did not abuse its discretion.

Because the statements were not offered for the truth of the matter asserted, no confrontation clause violation occurred. *Tennessee v. Street,* 471 U.S. 409, 413–14, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985); *see also United States v. Miller,* 771 F.2d 1219, 1233 (9th Cir.1985).

## III. *RICO*

■ We review the denial of Kirk's motion for acquittal in the light most favorable to the government to determine if a rational trier of fact could have found the essential elements of the RICO charge beyond a reasonable doubt. *See United States v. Arriaga–Segura,* 743 F.2d 1434, 1435 (9th Cir.1984).

■ Kirk contends that the government failed to prove a violation of RICO because it (1) failed to prove a "pattern" of racketeering activity and (2) failed to establish an enterprise "separate and apart" from the pattern of activity. Both contentions are without merit.

Kirk argues that the government failed to establish the requisite pattern of racketeering activity under RICO because all of the alleged acts of mail and wire fraud related to a single scheme to defraud, the Paradise Palms venture. This argument is

without merit because this circuit recently held that predicate acts may constitute a pattern of activity under RICO even though only a single scheme is involved. *See United Energy Owners Committee, Inc. v. United States Energy Mgt. Sys., Inc.*, 837 F.2d 356, 360–61 (9th Cir.1988); *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1363 (9th Cir.1987); *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191–94 (9th Cir.1987); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988).

■ Kirk also argues that the government failed to establish an enterprise separate and apart from the alleged acts of racketeering activity. The government has sufficiently alleged the existence of an enterprise. Although the circuits are divided on the requirements for proof of an enterprise under *United States v. Turkette*, 452 U.S. 576, 582–83, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981), under either test, the existence of a corporation fulfills the requirements of an ascertainable structure apart from the predicate racketeering activity. *Bennett v. Berg*, 685 F.2d 1053, 1060–61 (8th Cir.1982), *adopted upon reh'g en banc*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *see United Energy*, 837 F.2d at 361–64. Here, the government presented evidence of several lawful entities existing separately from the racketeering activities, including Paradise Palms Vacation Club, Inc., Paradise Palms Vacation Club Sales, Inc., W.P.M.K., and L.S.Q. Marketing.

Because the government has sufficiently proved a pattern of racketeering activity and an enterprise separate and apart from the pattern of activity, we affirm Kirk's RICO conviction.

AFFIRMED.