Gretchen **DUMAS**, as Guardian ad litem for Nicholas Chaset, and Irene Torres, as Guardian ad litem for Jon Rodriques, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

**MAJOR LEAGUE BASEBALL PROPERTIES, INC.,** Major League Baseball Players Association, NBA Properties, Inc., National Football League Players Association d/b/a NFL Players, Inc., and Players, Inc., National Hockey League Enterprises, NHL Players Association and The Walt Disney Company, Defendants.

No. 98 CV 1772–B (AJB).

United States District Court,
S.D. California.

May 14, 1999.

Kevin P. Roddy, Los Angeles, CA, William S. Lerach, Alan M. Mansfield, Randall J. Baron, James Swiderski, San Diego, CA, Melvyn I. Weiss, Micheal C. Spencer, New York City, Milberg Weiss Bershad Hynes & Lerach, Neil J. Moritt, Alan S. Hock, Moritt, Hock & Hamroff, Garden City, NY, Henry R. Rossbacher, Rossbacher & Associates, Los Angeles, CA, for plaintiffs.

K. Jill Osmars, Duckor Spradling & Metzger, San Diego, CA, Bruce S. Meyer, Michael Bresnick, Weil, Gotshal & Manges LLP, New York City, for National Football League Players Association.

Douglas B. Adler, Mark A. Snyder, Los Angeles, CA, Shepard Goldfein, Peter S. Julian, New York City, Skadden, Arps, Slate, Meagher & Flom, LLP, for Major League Baseball Properties, Inc., National Football League Properties, Inc, NBA Properties, Inc., and NHL Enterprises, L.P.

Michael Lipman, Coughlan, Semmer & Lipman, LLP, San Diego, CA, Harold F. McGuire, Jr., McGuire, Kehl & Nealon, LLP, New York City, Steven A. Fehr, Jolley Walsh Hurley Raisher & Roher, P.C., Kansas City, MO, for Major League Baseball Players Association.

Edward J. McIntyre, Solomon Ward Seidenwurm & Smith, LLP, San Diego, CA, John McCambridge, Michael P. Conway, Darlene K. Alt, Grippo & Elden, Chicago, IL, for National Hockey League Players Association.

Linda Dakin–Grimm, Los Angeles, CA, Eric J. Lobenfeld, New York City, Chadbourne & Parke, LLP, for The Walt Disney Company.

## ORDER DENYING MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(6)

BREWSTER, Senior District Judge.

### I. Introduction

This case raises the question whether licensors of intellectual property may be liable for the subsequent use of that property by manufacturers in a practice—the use of "chase" or "insert" cards—that this Court has stated may constitute an illegal form of gambling. *See Schwartz v. Upper Deck* (I), 956 F.Supp. 1552 (S.D.Cal.1997); *Schwartz v. Upper Deck* (II), 967 F.Supp. 405 (S.D.Cal.1997). Specifically, Plaintiffs, as proposed class representatives, contend that Defendant Licensors are in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the California Unfair Business Practices statute, Cal.Bus. & Prof.Code § 17200 *et seq.*, based on Defendants' "conduct or participation in the conduct of illegal gambling enterprises through their licensing of names, likenesses, logos, and other copyrighted property or licensable rights to be manufacturers of sports and entertainment trading card packages, some of which contain randomly inserted 'chase' cards ... of substantial value." *See* Compl. ¶ 1. Plaintiffs further allege that "the Licensors and the Manufacturers have conducted the affairs of the illegal gambling enterprises described herein as 'partners,' with the Licensors intimately involved in all phases of conceptualizing, designing, approving, marketing, advertising, and distributing sports and entertainment trading cards manufactured and distributed by the Manufacturers." *Id.* at ¶ 4.

Plaintiffs allege that the Licensors' illegal gambling activities include:

(a) licensing of names, likenesses, and other copyrighted properties and licensable rights to the Manufacturers;

(b) pursuant to licensing agreements negotiated and executed with the Manufacturers, retaining and exercising the right to review and approve all sports and entertainment trading card products and packages manufactured and distributed by the Manufacturers;

(c) pursuant to such license agreements, retaining and exercising the right to review and approve all advertising and promotional activities undertaken by the Manufacturers in connection with the sales and distribution of such trading cards;

(d) engaging in their own promotional and advertising activities in conjunction with the sales and distribution of such trading cards and

(e) receiving and distributing to their member teams and/or players millions of dollars in royalty payments received from the Manufacturers as payment for such licenses. *See* Compl. ¶ 37.

Plaintiffs make specific allegations regarding some of the Defendants, though the language of each allegation is the same. One particular facet of each allegation best provides the basis for a RICO claim. Plaintiffs claim that each Defendant "(c) approves of the practice of using randomly inserted chase cards, often with displayed odds, in the marketing, distribution, advertisement, promotion, and sale of [Defendant]-licensed sports cards." *See* Compl. ¶ 62, 69, 73.

Based on the above allegations, Plaintiffs assert that the Defendants have formed various associations-in-fact sufficient to satisfy § 1961(4) of RICO, *see* Compl. ¶ 78–79, that the Defendants have engaged in a pattern of racketeering activity under § 1961(1), *see* Compl. ¶ 80–91, and thus are in violation of §§ 1962(c) and (d) of RICO. Plaintiffs also contend that the Licensors are in violation of Cal.Bus. & Prof.Code § 17200 *et seq.*

## II.  Analysis

### A.  Standard of Law

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims in the complaint. A claim can only be dismissed without leave to amend if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to plaintiff. *See Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). The court need not, however, accept every allegation in the complaint as true; rather, the court "will examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir.1992) (citation omitted).

### B.  Analysis

Defendants, either jointly or on a independent basis, raise several bases on which the complaint should be dismissed. Each is considered in turn.

### 1.  Standing

Section 1964(c) of RICO requires plaintiffs to allege (1) that they have suffered injury to their business or property and (2) that defendants' violations of § 1962 caused their injury.[1] "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). In *Schwartz v. Upper Deck* (II), this Court stated "[p]laintiffs have suffered a tangible loss in that they have spent a fixed amount on chance to receive chase cards.... Plaintiffs have lost property, their money, and can recover that lost property under RICO." 967 F.Supp. at 414–15.

Defendants first argue that Plaintiffs do not have standing to pursue their claim because Plaintiffs are not "direct purchasers" as required by *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), incorporated into the "standing" requirement by *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and as applied to RICO cases by *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

In brief, these cases hold that "indirect" purchasers do not have standing to pursue a RICO cause of action because they have not been "injured in his business or property." The rationale behind the holdings lay in concerns that tracing injuries too far

---

**1.** The latter is not disputed by Defendants.

"downstream" would prove intractable and engage courts in undesirable line-drawing. In *Holmes,* the Court stated: "[R]ecognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk multiple recoveries.... [T]he need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon by plaintiffs injured more remotely." *Holmes,* 503 U.S. at 269–70, 112 S.Ct. 1311 (citations omitted). *See also Hanover Shoe,* 392 U.S. at 493, 88 S.Ct. 2224 (expressing concern that ascertaining damages would "require additional long and complicated proceedings involving massive evidence and complicated theories."). As such, only "direct purchasers" immediately downstream from the alleged violator may bring a RICO action.

Defendants attempt to shoehorn the Complaint's statement that "gambling activities detailed in this Complaint have been extremely remunerative, both for Licensors and the Manufacturers with whom they have entered into license agreements" into this "pass-on" defense by inferring that the Manufacturers have increased trading card prices to their wholesale distributors, who in turn have passed these overcharges down the line to retailers and eventually to the consumers. The Court is unable to discern the same inference. Paragraph 28, cited by Defendants, is hardly support for such an inference. It merely alleges that the Manufacturers sell, transport, and distribute their trading cards throughout the United States and thus engage in interstate commerce. That is hardly a statement regarding overcharges or how those overcharges, if any, might have been "passed on."

More important, as alleged, this case is not about removed, indirectly injured plaintiffs. The alleged class is directly injured. The chase cards scheme is not targeted at intermediaries, but directly at consumers. These consumers are the first victims. It is consumers who immediately engage in the alleged lottery in their search for chase cards. Thus, concerns regarding indirect, remote plaintiffs are not at issue. In fact, as stated by the Court in its Order Denying Class Certification in *Schwartz,* there is no cause of action at all unless a consumer can demonstrate purchase of the cards because of the hope of obtaining a chase card. *See Schwartz v. Upper Deck* (III), 183 F.R.D. 672, 682 (S.D.Cal.1999). Thus, intermediate parties such as retailers may have no cause of action. As only one level of purchasers is alleged to be injured, and, in fact, is injured, the Court need not be concerned about "complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts." *Holmes,* 503 U.S. at 269, 112 S.Ct. 1311.

Furthermore, *Holmes'* concern regarding "the general interest in deterring injurious conduct," *id.,* is very much implicated in the present case as the purportedly injured wholesalers and retailers *cannot* be counted on "to vindicate the law as private attorneys general." *Id.* at 270, 112 S.Ct. 1311. Unless demonstrated otherwise, the Court assumes that wholesalers and retailers benefit from the sales to those who buy trading cards in the hope of finding chase cards. Simple economics— as inferred from the Complaint—suggest that the lure of chase cards has driven up demand, leading to price increases. *See, e.g.,* Compl. ¶ 45 ("The engine that currently drives the Manufacturers' ability to sell their huge inventories is the lure of 'chase' or 'insert' cards ... As a result of this trend, the average retail price of a package of trading cards has increased from 75 cents in 1990 to $3.00 in 1996, a period of low annual inflation rates.") and ¶¶ 46–48. Wholesalers and retailers presumably benefit from the increased demand and price inflation. They thus may not be injured in the first place. Moreover, as likely beneficiaries of the allegedly

illegal conduct, they are improbable plaintiffs to be relied upon to bring suit on behalf of consumers.

In sum, neither the facts nor the policy concerns of any of the Supreme Court's "direct purchaser" cases are presented in the instant matter. Quite the opposite is true; to apply the "direct purchaser" rule to bar this class of Plaintiffs standing would likely mean that no plaintiff would step forward to challenge what is alleged to be illegal conduct. The Court sees no reason to upset its holding in *Schwartz v. Upper Deck.*

### 2. Direct, Operate, or Manage a RICO Enterprise

Section 1962(c) of RICO provides: "It shall be unlawfully for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity." In turn, § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

Defendants attack Plaintiffs' allegations on three fronts: (1) Plaintiffs fail to allege sufficient facts, as opposed to allegations, to support their claim; (2) Plaintiffs fail to allege the minimum requirements necessary for the existence of an association-in-fact; and (3) even if there is an enterprise, the Complaint fails to allege that the Licensors participated in the operation or management of such an enterprise.

#### a. *Sufficient Factual Allegations*

■ Defendant Walt Disney ("Disney") argues that Plaintiffs have failed to plead

sufficient facts to demonstrate that the Defendants directed, operated, or managed a RICO enterprise. Disney asserts that conclusory allegations are insufficient to meet the Plaintiffs' burden. *See, e.g., Comwest, Inc. v. American Operator Servs.,* 765 F.Supp. 1467, 1475 (C.D.Cal. 1991); *see also Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989) ("In order to avoid dismissal for failure to state a claim, a [RICO] plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise."). Disney argues "plaintiffs here have not alleged any facts or conduct on the part of Disney which would satisfy *Reves.* All Disney is doing is monitoring and approving of how their legally-protected characters are depicted by a licensee to the public at large .... the complaint does not contain an iota of information as to any other Disney conduct or activity and thus is insufficient to allege a RICO violation." *See* Disney Reply, p. 4.

Plaintiffs state that "[p]aragraphs 4, 13–17, 27–29, 31–37 and 38–74 allege that the Licensors and Manufacturers are 'partners' and that the Licensors are intimately involved in all phases of conceptualizing, designing, approving, marketing, advertising, and distributing trading cards sold by the Manufacturers.... [T]hese allegations sufficiently charge that the Licensors 'participate[d] in the operation or management of' the association-in-fact enterprises, in violation of § 1962(c)." While Plaintiffs do not provide the Court with copies of the licensing agreements, or even cite to any specific provisions of the licensing agreements which provide the Licensors with the authority to approve or disapprove of the practice of using chase cards, that is not their duty.[2] This Court must accept as true the Complaint's material allegations

2. Disney asserts that Plaintiffs must have these licensing agreements in their possession, as the Complaint quote and paraphrase from them. As such, Disney asserts, the liberal treatment of a plaintiff's allegations normally applied in Rule 12(b)(6) motion should not be applied. Instead, a court is "not required to accept as true conclusory allega-

tions which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295–96 (9th Cir.1998). However, while Disney may see its own licensing agreements reflected in the Complaint, the Court has no such knowledge. Certainly, the Plaintiffs' references are not explicit.

*and* the reasonable inferences to be drawn. *See Parks,* 51 F.3d at 1484. Plaintiffs have met their burden.

Taking the Complaint in its most favorable light possible, the Court must read into the allegation in ¶ 37(b)—"retaining and exercising the right to review and approve all sports and entertainment trading card products and packages manufactured and distributed by the Manufacturers"—as a right to approve of—or to veto—the manufacture, marketing, and distribution of chase cards.[3] The Court finds particular support in Plaintiffs' Exhibit 7, an advertisement with the caption, "Collect'em. Trade'em. Chase'em. Or just look at'em. But whatever you do, you've go to have'em." Along with this caption is the prominently displayed Major League Baseball logo. In sum, though sparse in supporting facts, Plaintiffs' allegations are sufficient to survive a motion to dismiss.

### b. *Association–in–Fact*

█ The League Licensors argue that Plaintiffs do not allege as a matter of law the minimum requirements for the existence of an association-in-fact enterprises. An association-in-fact must "be 'an entity separate and apart from the pattern of [racketeering] activity in which it engages.'" *See Chang v. Chen,* 80 F.3d 1293, 1298 (9th Cir.1996) (alteration in original) (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). More specifically, Defendants point the Court to *Chang*'s statement that "[a]t minimum, to be an enterprise, an entity must exhibit 'some sort of structure . . . for the making of decision, whether it be hierarchical or consensual.' The structure should provide 'some mechanism for controlling and directing the affairs of the group on an ongoing, rather than ad hoc, basis.'" *Id.* at 1299 (citing *United States v. Riccobene,*

709 F.2d 214, 222 (3d Cir.1983)). Based on this statement, Defendants argue that Plaintiffs make no allegation, nor can they make an allegation, that there is any "structure" to the approximately twenty association-in-fact enterprises alleged. Indeed, the Licensors contend that "the alleged 'enterprise' is nothing more than the licensing agreement itself, the very conduct complained of as the racketeering activity." Lics.' Mem. P & A, p. 14. The Licensors argue that, at best, language in Plaintiffs' RICO Case Statement that each of the "alleged association-in-fact enterprise(s) consisting of the Licensors and the Manufacturers is an ongoing organization and its members function as a continuing unit," is conclusory and thus insufficient to survive a motion to dismiss. *See* Pls.' RICO Case Statement, p. 12–13.

The rationale behind *Chang*'s holding lay in a concern that, absent allegations of a separate entity with a decisionmaking structure, § 1962(c)'s "enterprise" element would be rendered superfluous. *Id.* at 1299. If *Chang* were the only case on this matter, the Licensors would appear to have a conclusive argument. However, the case law on this matter is not so simply categorized. Indeed, *Chang* itself is a peculiar case in that the court reaffirmed the Ninth Circuit's rule put forth in *United States v. Feldman,* 853 F.2d 648, 660 (9th Cir.1988), that "involvement of a corporation which has an existence separate from its participation in the racketeering activity can satisfy the enterprise element's requirement of a separate structure." *Chang,* 80 F.3d at 1300. However, *Chang* sidesteps this holding by finding that the corporation alleged to be part of the association-in-fact, "played no role whatsoever, legal or fraudulent, in the operations of the alleged enterprise." *Id.* at 1301. Furthermore, *Chang* is a case in which the plaintiff

---

**3.** "Approval" and its implied veto might be limited to the design elements of the Manufacturers' cards. This is a possible inference from the overall context of the Complaint and its Exhibits. However, reading the Complaint liberally, i.e., in its most favorable light possible, dictates that such an inference remain an unassumed one. Still, the reach of the Licensors' "approval" may be a subject of future interest for the Court.

apparently did not even include the corporation as a defendant.

Clearly, those are not the facts in the instant matter. Casting doubt on the utility of *Chang,* one treatise reads: "Unless the court overrules *Feldman,* it will be very easy for plaintiffs to avoid the same pleading mistake in the future. Thus, it remains to be seen whether *Chang* results in any significant tightening of the Ninth Circuit's definition of an association in fact." David B. Smith and Terrance G. Reed, Civil RICO, ¶ 3.06, p. 3–64 (Matthew Bender 1998). Here, Plaintiffs have not repeated the mistake of the plaintiff in *Chang.*

Defendants likewise fail to address *River City Markets, Inc. v. Fleming Foods West Inc.,* 960 F.2d 1458, 1461–62 (9th Cir.1992). *River City* involved allegations under RICO that two supermarket chains conspired to "unload" unprofitable properties on plaintiff purchasers. Plaintiffs, as in the instant case, alleged that the two corporations combined to form an association-in-fact enterprise. 960 F.2d at 1460–61. Relying on *Turkette,* the court stated that "we have recognized that a group of individuals or corporations may together constitute a RICO enterprise even though they do not incorporate or otherwise form a legal entity." *Id.* at 1461. The court upheld the sufficiency of the plaintiffs' allegations:

> The district court dismissed the RICO counts under the mistaken belief that *Rae v. Union Bank,* 725 F.2d 478 (9th Cir.1984), requires that a RICO enterprise 'must be an entity separate and distinct from the defendants.' … *Rae* does not so hold, and we find nothing in our RICO case law which instructs that two contracting business entities cannot form an 'enterprise' for RICO purposes and still be named as individual RICO

defendants, provided the enterprise falls within the statutory proscriptions. (¶) *Rae* … stands for the proposition that a single individual or entity cannot be both the RICO enterprise and an individual RICO defendant. *Rae* simply embodies the maxim that an individual cannot associate or conspire with himself…. [P]laintiffs do not allege that either Alpha Beta or Fleming is simultaneously a RICO enterprise and a RICO defendant. Each of the plaintiffs' complaints pleads the existence of a RICO enterprise as follows: '… [Alpha Beta and Fleming] associated together to form an enterprise within the meaning of Section 1961(4) which devised a scheme to defraud Plaintiffs and other members of the public by inducing them to purchase ALPHA BETA stores….' What plaintiffs allege is that Alphas Beta and Fleming associated together in a business relationship akin to a joint venture to market the grocery stores, and that it was this 'enterprise' with which each individual defendant interacted in conducting the alleged pattern of mail and wire fraud activities.

Plaintiffs' allegations in the instant matter are of the same nature.

■ Next, Plaintiffs rebut the alleged deficiencies in the Complaint regarding the supposed lack of distinction between the association-in-fact enterprises and the pattern of racketeering activity. Plaintiffs argue that because each of the Licensors is a corporation,[4] it is sufficient of itself to give an enterprise structure apart from the racketeering activity, citing *Webster v. Omnitrition Int'l,* 79 F.3d 776, 786 (9th Cir.1996) ("The participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity:

4. Plaintiffs are incorrect that each licensor is a corporation. *See, e.g.,* Saskin Aff. ¶ 2: "The NHLPA is an unincorporated association." Likewise, Plaintiffs' Complaint acknowledges that Defendant Major League Baseball Players Association is a non-profit organization. *See* Compl, ¶ 13(b). While not technically corporations, the *Feldman* rule would appear to apply to unincorporated associations and organizations alleged to be part of associations-in-fact should these non-corporations have a structure on par with a corporation. However, the Court will consider this an open question for purposes of any further motions.

'corporate entities have a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure.'") and *United States v. Kirk*, 844 F.2d 660, 664 (9th Cir.1988) ("[T]he existence of a corporation fulfills the requirements of an ascertainable structure apart from the predicate racketeering activity.").

*Webster* involved civil RICO allegations against corporate participants in a "multi-level marketing," or "pyramid," scheme. One defendant argued that the plaintiff "must show the existence of an ascertainable structure of the enterprise apart from the alleged racketeering activity (i.e. the operation of a pyramid scheme)." The court rejected this argument: "The participation of a corporation in a racketeering scheme is sufficient, of itself, to give the enterprise a structure separate from the racketeering activity: 'corporate entities ha[ve] a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure.'" 79 F.3d at 786 (alteration in original) (citation omitted).

The tension between *Chang* and *Webster* is obvious. One district court has attempted to reconcile the conflict with the following logic: "an enterprise must have 'an existence beyond that which is merely necessary to commit the predicate acts of racketeering' and 'some sort of structure for the making of the decisions,' but this requirement may be fulfilled by the simple inclusion of a corporation as a participant in the enterprise." *See Pharmacare v. Caremark*, 965 F.Supp. 1411, 1423 (D.Hawaii 1996). The logic in *Pharmacare* is not mutually exclusive. The "enterprise" element requiring an existence beyond the predicate acts is not necessarily forwarded solely by inclusion of a corporate defendant as one—or even both—of the alleged RICO violators. That inclusion turns the focus away from the enterprise issue and back to the individual actor. The structure should be that of the enterprise, not the inherent structure of an individual participating in the alleged enterprise. The argument would be that there has to be an enterprise, but no enterprise is necessary if one of the participants in the RICO scheme is a corporation. From this Court's perspective, this gloss on the statute effectively reads out of existence altogether the requirement that there be an "enterprise."

Likewise, *Webster* is factually distinguishable from the instant matter because, as the Licensors note, the corporate defendant in *Webster* was established solely to conduct the alleged illegal activities. The situation is arguably different when an otherwise legitimate corporation is alleged to be part of an association-in-fact.

However, such doubts aside, this Court is constrained to follow Ninth Circuit case authority. In light of the holdings of *Feldman* and *Kirk* that mere inclusion of a corporation as a defendant satisfies the separate existence requirement,[5] and because this case cannot fit into the peculiar box of *Chang* (which, of course, reaffirmed *Feldman*), the Court finds Plaintiffs have sufficiently alleged associations-in-fact. Perhaps only this much can be said: "Since the 'separate existence' inquiry belongs to the realm of medieval scholasticism this view is as valid as any other." Civil RICO, supra, ¶ 3.06, p. 3–62.

c. *Participation in Operation or Management of a RICO Enterprise.*

■ Even if Plaintiffs have sufficiently plead various associations-in-fact, Defendants further argue that Plaintiffs fail to sufficiently allege that the Licensors "conduct or participate, directly or indirectly," in the operation or management of association-in-fact enterprises as required by § 1962(c), as interpreted by *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The Licensors interpret *Reves* as standing for the principle that "a defendant that does not participate

5. *See also United States v. Blinder*, 10 F.3d 1468, 1473–1475 (9th Cir.1993).

in the operation or management of the alleged enterprise may not be held liable under RICO, even if the defendant knew of the alleged unlawful activities and benefitted from those activities." Lics.' Mem. P & A, p. 15.

More specifically, the Licensors argue:

Although the allegations of the plaintiffs' complaint clearly allege a business relationship between the Licensors and the Manufacturers, they do not, and cannot, allege that the Licensors participate in the operation or management of an alleged RICO enterprise.... At best, however, plaintiffs allege that each of the Licensors' licensing agreement contains standard quality control provisions that give the Licensor the right to ensure that all licensed products ... meet and conform to high standards of style, quality, and appearance.... To suggest that the legal duty imposed on intellectual property owners to oversee the quality of their licensees' products satisfies the 'operation or management' requirement of Reves would unfairly expose all intellectual property licensors to RICO liability for the conduct of their licensees. See Lics.' Mem. P & A, p. 16–17.

In *Reves*, the Supreme Court stated: "An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control of it as, for example, by bribery.... (¶) [Section] 1962(c) cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs. Of course, 'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the operation or management of the enterprise itself...." 507 U.S. at 184–85, 113 S.Ct. 1163 (emphasis in original).

The parties have fundamental differences over the very meaning of *Reves*. The critical question appears to be whether the various Licensors "approved" of the practice of insert or chase cards. If true, would such approval rise to the level of "directing" or "conducting" the operation or management of a RICO enterprise? To put the question another way, is the *Reves* test useful solely in limiting the reach of RICO liability to "outsiders" performing services for alleged RICO enterprises? On one occasion, this Court has so interpreted *Reves*. "The *Reves* test is intended to protect outsider, professional service provides who might assist a racketeering enterprise." *Gutierrez v. Givens*, 1 F.Supp.2d 1077, 1086 (S.D.Cal.1998).

Plaintiffs echo this insider-outsider distinction, claiming that, "*Reves* does not save the Licensors from liability where (as here) the enterprises are alleged to be associations-in-fact of the Licensors and Manufacturer and each one of the defendants is alleged to be an enterprise 'insider,' not an 'outsider.'" Pls.' Mem. P & A, p. 9–10.

If the Court had found that Plaintiffs could not plead as a matter of law that the Licensors and Manufacturers formed several associations-in-fact, this would be a relatively easy question. Assuming that the licensing arrangements did not demand or give veto power over the use of chase cards, the Court would then be able to construe the Licensors as "outsiders," despite possible knowledge of the alleged racketeering activity, because the licensing relationship would be insufficient to demonstrate participation in the operation or management of the RICO enterprise.[6] However, Plaintiffs' allegations are sufficient to plead associations-in-fact. Thus, cases involving parties associated with enterprises who are in fact outsiders and not alleged to be members of the association-in-fact—in almost every case, providers of professional services—are inapposite.

---

**6.** However, Plaintiffs still might escape such an "easy" question because they plead conspiracy. Some courts have evaded the dictates of *Reves* on this ground. *See, e.g., Ma-*

*danes v. Madanes*, 981 F.Supp. 241, 256–60 (S.D.N.Y.1997); *Morin v. Trupin*, 835 F.Supp. 126, 133–36 (S.D.N.Y.1993).

For instance, Defendants rely heavily on *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993). However, in *Baumer*, involving the liability of an attorney who participated to some extent in the alleged fraud, the court found "sporadic" activity, limited to providing legal services, insufficient to meet the requirement that one play "some part in directing the enterprise's affairs." *See also University of Maryland at Baltimore, et al. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir.1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result. There must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus."). *See also Biofeedtrac, Inc. v. Kolinor*, 832 F.Supp. 585, 592 (E.D.N.Y.1993) ("[P]laintiff has adduced no facts to suggest that [the defendant's] actual or projected role was to 'lead, run, manage, or direct' any part of the enterprise. Thus, he did not participate in the 'conduct' of an enterprise and did not violate § 1962(c), even though he may have intentionally assisted a scheme to defraud.").

Defendants also rely on *Goren v. New Vision Int'l*, 156 F.3d 721 (7th Cir.1998). *Goren* involved the liability of a doctor who licensed the use of his name and an informational tape to an enterprise allegedly involved in an unlawful scheme to sell bogus health care products. Attractive because it involves the liability of a licensor, the holding of *Goren* is a re-affirmation of the rule that simply providing services—without more—is insufficient to be held liable under § 1962(c). However, the licensor point is not determinative. In fact, the *Goren* court took specific pains to distinguish its facts from the situation in which a plaintiff alleges an association-in-fact. Referring to *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F.3d 967, 977–979 (7th Cir.1995), the *Goren* court stated:

[In *MCM Partners* we] held that the defendants could be liable because they had knowingly implemented the decisions of upper management and thereby participated in the direction of the enterprise. In reaching that decision, we stressed that '[t]he primary fact leading us to this conclusion is the nature of the "enterprise" [plaintiff] has depicted, as both [defendants] are alleged to be members of an "association-in-fact" enterprise constituting the RICO enterprise.' In this case, by contrast, the enterprise alleged is New Vision, not an association-in-fact. Dr. Wallach, Direct, and October are not alleged to be part of the enterprise and therefore cannot be said to conduct the affairs of the enterprise by implementing the decisions of upper management. Instead, these defendants are best characterized as contractors hired by the enterprise to perform specific tasks. *Id.* at 728 n. 3.

Based on this language, the defining difference is whether or not a plaintiff pleads that individuals are members of the association-in-fact.

Defendants insist that this "outside" vs. "inside" distinction may be a false one. For instance, in *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir.1997), another case involving professional liability, the court stated: "Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise." Likewise, *Handeen* diminishes the outsider/insider distinction in *Reves*: "The Court did reference the distinction between 'outsiders' and 'insiders' to a RICO enterprise, but only in response to an argument by amicus that the operation or management test exemplifies an overly crabbed reading of the Act which unnecessarily limits the liability of outsiders." *Id.* at 1349 n. 12.[7] The Court

---

7. Disney likewise asserts that "the term 'outsiders' is found in the *Reves* decision only

because it had been used in an amicus brief

agrees that § 1962(c) liability should be based less on status, and more on acts of participation. It has so held. *See Gutierrez v. Givens,* 989 F.Supp. 1033 (S.D.Cal. 1997). But such a holding is based on imposing liability on outsiders who have committed acts to such a degree that they forfeit their outsider status. It is a different question when a plaintiff alleges a defendant to be part and parcel of the enterprise in the first place. It may seem an injustice that the *Reves* test could be so easily met merely by how one frames their allegations. Yet, for the purposes of a motion to dismiss, the Court is constrained by the overwhelming majority of case law on the subject.

Finally, Disney asserts that "courts have repeatedly held that a lawful contractual relationship (which is what Disney's license agreements are) cannot constitute participation in conducting an enterprise within the meaning of Reves, even if the contracting party is both essential to the RICO enterprise and is a direct participant in the scheme," citing *Arenson v. Whitehall Convalescent & Nursing Home, Inc.,* 880 F.Supp. 1202, 1209 (N.D.Ill.1995) and *Comwest, supra,* 765 F.Supp. at 1475. *See* Disney Mem. P & A, p. 7. Disney's statement does not stand up to close examination. *Arenson*'s statement, made in reference to one of the two alleged counts, that "[a]llegations of a simple supplier-purchaser relationship are insufficient to allege that [the corporation-purchaser] participated in the operation or management of [the supplier]," *id.* at 1209, is inapposite to the instant matter. In that situation, the court held that allegations of receipt of goods were insufficient to establish participation in the operation or management of the supplier. But the court upheld the alternative count where the supplier and purchaser were alleged to be the RICO enterprises. The latter situation is the one at hand. Likewise, in *Comwest,* the court stated that the "parties' agreements do not suggest that the parties contemplated any relationship beyond an arms-length transaction between two independent corporate entities." *Id.* at 1475. However, this statement did not apply to the plaintiff's association-in-fact cause of action. As such, it is not applicable in this matter.

In sum, an analysis of *Reves* and subsequent case law demonstrates that Plaintiffs' claims cannot be dismissed as a matter of law. Of course, in subsequent proceedings, Plaintiffs may be required to demonstrate to the Court how the Licensors—on an individual basis[8]—are involved in conducting or directing the affairs of each alleged association-in-fact.

### d. Section 1962(d)

Because Plaintiffs have sufficiently alleged violations of § 1962(c), Plaintiffs § 1962(d) claim need not be dismissed.

### 3. Racketeering Activity

Plaintiffs allege that the Licensors committed and/or aided and abetted RICO predicate acts under 18 U.S.C. § 1961(1)(A) and (B).

### 1. Section 1961(1)(A); Misdemeanor vs. Felony Offenses

Defendants point out that even if the complained-of activity constitutes a violation of Cal.Penal Code § 319, that section is only a misdemeanor offense and thus insufficient to constitute a predicate act of racketeering activity under 18 U.S.C. § 1961(1)(A) (requiring that the alleged racketeering activity be "chargeable

submitted in that case and the Court, rejecting the argument proposed by the amicus brief, referenced the term." Mem. P & A, p. 10. As well as that may be the case, the facts of *Reves* demonstrate it to be built on this insider vs. outsider distinction. *Reves*' progeny have distilled that factual distinction into a virtual rule of law.

8. Though it has treated the individual defendants in the aggregate for purposes of testing the sufficiency of Plaintiffs' claims, the Court agrees with Defendant NHLPA that "lumping the defendants together and making generalized allegations against the group" may be insufficient for purposes of further motions.

under State law and punishable by imprisonment for more than one year"). However, the Complaint alleges violations of New York Penal Code §§ 225.10(2) and 225.20(2) and New Jersey Stat.Ann. §§ 2C:37–2(a)–(b) and 2C:37–3(a)–(c).

In *Schwartz* I, 956 F.Supp. at 1557–59, and *Schwartz* II, 967 F.Supp. at 411–14, this Court held that the alleged conduct may have violated the gambling laws of both New York and New Jersey. The latter is not at issue in the instant matter as no plaintiff resides in that state or is alleged to have bought trading cards there.

At oral argument, Defendants suggested that the Court revisit its previous interpretation of New York law in *Schwartz* on the grounds that gambling losses are not recoverable under New York law except in the very limited circumstances that recovery may be had from the winner of the game, that the loss be in excess of $25 in any one sitting or at any one time, and that recovery be sought within three months of the gambling payment. *See Fishman v. Marvel Entertainment Group, Inc.*, NO. CV–963757 (E.D.N.Y. Aug. 12, 1997) (included as Exhibit 3 in Klein Aff.).

It might be inferred that the court in *Fishman* held that gambling losses were not recoverable under New York law. *Id.*, slip op. at 13–14. While concluding that New York does allow recovery of gambling losses, though perhaps on very limited and on an exceptional basis, the court did not specifically hold that the plaintiffs in that case could not recover gambling losses as a matter of law. Instead, the court found that recovery was precluded irrespective of the limitation of New York law because it construed plaintiffs' damages to be mere personal injuries. *Id.* at 14 ("Even if these limitations did not exist, however, the Court does not find that these statutes in and of themselves establish injury to plaintiffs under RICO."). Indeed, in *Fishman*, the court obviously regarded plaintiffs' allegations as a species of personal injuries

rather than an injury to property, stating, "the core injury that drives [plaintiff's] complaint is their 'habit,' of or 'addiction' to purchasing trading card packs that may contain 'chase' cards." *Id.*, slip op. at 15. This Court has stated that "habit" injuries are not the gravamen of Plaintiffs' cause of action. Because *Fishman* is not based on a thorough analysis of New York law, *Fishman* lacks the instructive quality that might make this Court reconsider its construction of New York law.

### 2. Section 1961(1)(B); Federal Predicate Acts

■ For purposes of § 1961(1)(B), Plaintiffs need not allege violation of a state felony statute; violation of even state misdemeanor statutes is sufficient. *See United States v. Polizzi*, 500 F.2d 856, 873 n. 17 (9th Cir.1974). Plaintiffs have alleged violations of 18 U.S.C. §§ 1952, 1953, and 1955.[9] In its Order Denying Class Certification in *Schwartz v. Upper Deck*, this Court held that Plaintiffs' allegations of violations of various federal statutes are underpinned by its allegations of violations of state law. Even if Defendants are correct that the Court misinterpreted New York law in its previous orders, Plaintiffs have alleged a violation of California law, which, in turn, would form the basis of a violation of federal statute.

### 4. Cal.Bus. & Prof.Code § 17200: whether insert cards constitute gambling under California law

■ Defendants argue that Cal.Penal Code § 319.3—expanding the definition of an illegal lottery contained in § 319 to include "sports trading card grab bags"—limited the reach of the Penal Code to these grab bags, i.e., originally packaged sports trading cards cannot constitute an unlawful lottery. Based on this interpretation, Defendants argue that the Plaintiffs' claim under Cal.Bus. & Prof.Code § 17200 *et seq.* must then fail for failure to allege an unlawful predicate act. *See Hob-*

9. Plaintiffs imply that the Court's interpretation of § 1953 may be incorrect. The Court notes this objection and will, of course, reconsider any possible errors should the matter become pertinent at a later date.

by *Indus. Ass'n of Am. v. Younger*, 101 Cal.App.3d 358, 371, 161 Cal.Rptr. 601 (1980) (where predicate statute excludes particular behavior from its proscription, plaintiffs may not challenge that behavior under § 17200).

Defendants read clarity into the law where there is none. *See* Lics.' Mem & P & A, p. 20. Little indicates that § 319.3 was enacted to render all other possible uses of sports trading cards immune from liability. Review of the statutory language indicates that Defendants' statutory interpretation is misguided. First, § 319.3(a) uses language of *"[i]n addition to* Section 319, a lottery *also* shall include ..." when referring to the illegal sports cards grab bags. (Emphasis added). Thus, it is language of inclusion, and not language that would lead one to conclude that the Legislature meant to exclude other sports cards activities that might otherwise constitute illegal lotteries under the more general definition of lottery. Second, in defining "sports trading card grab bag," the Legislature was careful to exclude only "procedure[s] for the distribution of any sports trading card of value by lot or by chance, *which [are] not unlawful under other provisions of law." See* § 319.3(b)(1) (emphasis added).

In contrast, § 319 itself uses broad language of prohibition, defining a lottery with terminology such as "any scheme" and "by whatever name the same may be known." Because the use of "chase" cards may violate § 319, the Court finds that Plaintiffs have stated a claim under Cal. Bus. & Prof.Code § 17200. No principle of *expressio unius, exclusio alterius* applies.

### III. Conclusion

Upon review of the moving papers, and after oral argument, Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED.

IT IS SO ORDERED.