**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Humberto ROSALES–LOPEZ,**
**Defendant-Appellant.**

**No. 79–1302.**

United States Court of Appeals,
Ninth Circuit.

March 20, 1980.

Rehearing Denied May 12, 1980.

John J. Cleary, Federal Defender, San Diego, Cal., for defendant-appellant.

Irene Takahashi, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Irene Takahashi, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before WALLACE and ANDERSON, Circuit Judges, and PALMIERI,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Defendant Humberto Rosales-Lopez appeals his conviction below for one count of

---

* The Honorable EDMUND L. PALMIERI, Senior United States District Judge, Southern District of New York, sitting by designation.

conspiracy to conceal, harbor and shield, and illegally transport aliens in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324, three counts of aiding and abetting the illegal transportation of aliens in violation of 8 U.S.C. § 1324(a)(2) and 18 U.S.C. § 2, and three counts of concealing, harboring and shielding aliens in violation of 8 U.S.C. § 1324(a)(3). Rosales-Lopez was sentenced to serve five years for each count, with each sentence to run consecutively, but the sentences for each of the last six counts were suspended. We affirm on all issues.

## I. *BACKGROUND*

Rosales-Lopez, a resident alien, was involved in an illegal alien smuggling operation in Southern California. Briefly stated, the object of the plan was to transport aliens who had surreptitiously crossed the Mexican-American border from a point in Imperial Beach, California, by automobile up Interstate Five to a drop point in Los Angeles. Rosales-Lopez' conviction in December 1978, arises from his arrest for the transportation of three Mexican aliens from Imperial Beach to Los Angeles.

The three aliens, led by a guide whose identity remains unknown, left Tijuana on foot and crossed the border under cover of darkness. The guide took them to a car parked on the American side of the border, and drove them to the residence of Virginia Hendricks Bowling in Imperial Beach. Bowling, an American citizen, lived at the Imperial Beach residence with her daughter. Sometime in July 1978, Rosales-Lopez had become romantically involved with Bowling's daughter and had moved into the Imperial Beach residence. When the three aliens whose entry is at issue here arrived early on the morning of December 11, Rosales-Lopez admitted them, along with the guide, into the garage of the Bowling house.

The method of transporting the aliens apparently conformed to a plan which had been followed on previous occasions. The guide and the aliens entered the trunk of a green Oldsmobile, and Rosales-Lopez closed the lid of the trunk. Bowling then entered the Oldsmobile and drove it north on Interstate Five through the San Clemente checkpoint, with Rosales-Lopez following in a grey Ford. Once both automobiles had cleared the checkpoint, they pulled off into a parking lot and Bowling exchanged cars with Rosales-Lopez. The guide emerged from the trunk of the Oldsmobile and proceeded to drive to Los Angeles, with Rosales-Lopez seated on the passenger side. The purpose of Bowling driving the car through the checkpoint was to deter suspicion by avoiding the use of a Latin-appearing driver. Bowling returned to Imperial Beach in the Ford, following the exchange of cars.

The Oldsmobile was driven to an apartment in Los Angeles, where the aliens were let out of the trunk and told by Rosales-Lopez to go upstairs into the apartment. The apartment was apparently occupied by a number of other illegal aliens who had been transported to the location by other means. Sometime after the arrival of Rosales-Lopez, the guide, and the three aliens, the other named principals in the smuggling arrangement, David Falcon-Zavala and Joe Manuel Flores, arrived at the apartment, apparently under orders from a person higher up in the smuggler's chain of command. Falcon-Zavala and Flores were to be involved in the transportation of the numerous aliens present at the apartment to specific locations in Southern California which were the aliens' ultimate destinations.

Agents of the Immigration and Naturalization Service had been maintaining surveillance over both the Los Angeles apartment and the Imperial Beach residence for a number of weeks prior to December 11. In fact, agents had followed the progress of the green Oldsmobile from Imperial Beach to Los Angeles that morning. Agents had observed Rosales-Lopez open the trunk of the Oldsmobile at Los Angeles, and had also observed the aliens leave the trunk and

proceed up the stairs. In addition, automobile traffic around the apartment had been heavy. The agents concluded that the apartment was being used as a drop site for illegal aliens.

At approximately noon on December 11, Flores departed in an automobile with two of the aliens. Agents stopped the Flores car a few blocks away and obtained admissions from the aliens that they were present in the United States illegally. A short time later, Rosales-Lopez, Falcon-Zavala, and one of the aliens who had been transported in the trunk of the Oldsmobile left the apartment in another automobile. Agents approached the car while it was stopped at a gas station. All three occupants were arrested. A short time later, agents raided the apartment, and all of the aliens present were taken into custody.

Rosales-Lopez, Flores, Falcon-Zavala, and Bowling were originally indicted on sixteen counts of conspiracy, harboring and shielding aliens, aiding and abetting, and illegal transportation of aliens. Falcon-Zavala and Bowling each plead guilty to misdemeanors. Flores became a fugitive whose whereabouts apparently remain unknown. A superseding indictment filed February 9, 1979, charged Rosales-Lopez and Flores with seven counts of conspiracy, concealing and harboring, illegal transportation, and aiding and abetting. Rosales-Lopez was convicted and sentenced on each count. Procedural details will be developed as necessary in the opinion.

## II. *ISSUES ON APPEAL*

Rosales-Lopez raises seven issues on appeal:

(1) Whether the district judge's voir dire of the jury venire was adequate to detect potential bias or prejudice;

(2) Whether the trial court erred in refusing to provide Rosales-Lopez, an indigent, with a free copy of the transcript of a suppression hearing;

(3) Whether sentencing was improperly imposed by a district judge who did not preside at trial;

(4) Whether the district court erred by denying Rosales-Lopez an evidentiary hearing on possible prosecutorial vindictiveness;

(5) Whether the district court erred in refusing to give an instruction on a lesser-included offense;

(6) Whether consecutive sentences were improperly imposed;

(7) Whether the exemption from prosecution for employers contained in 8 U.S.C. § 1324 denies Rosales-Lopez equal protection of the laws.

## III. *VOIR DIRE*

Pursuant to the "Arizona Plan" utilized in the Southern District of California, the trial judge conducted the voir dire of the jury venire. Counsel for Rosales-Lopez submitted several requested questions to the court prior to voir dire, a number of which the judge declined to ask. Rosales-Lopez claims reversible error in the court's failure to make six specific inquiries.

 We affirm as to five of the six with only brief comment.[1] The scope of voir dire is a matter within the sound discretion of the trial judge, and will not be disturbed on appeal unless the procedures used or questions propounded are so unreasonable as to constitute an abuse of discretion. *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979). After reviewing the

---

1. The five requested questions were phrased as follows:

"6. Have you ever employed or have had friends that have employed illegal aliens?"

"13. Have you ever worked for the federal Government? If so, as what? How long?"

"16. Have you ever been a victim of a crime?

"18. Have you ever sat as a juror in a civil or criminal case? What was the nature of the case and the verdict?"

"23. Are you able to speak Spanish? If so, how well? Would you be willing to accept the interpreter's translation?"

entire voir dire procedure, we cannot say that the questions propounded were insufficient to probe for bias. We find no error generally in the refusal to ask five of the six questions.

■ Rosales-Lopez also requested that the court inquire whether his Mexican descent would affect the jurors' deliberations.[2] While we also affirm on this question, we feel that a more extended discussion is in order. A longstanding rule of criminal justice in the federal courts holds that questions regarding possible racial prejudice should be put to the venire in prosecutions of minority defendants, at least where "special circumstances" indicate that the defendant's race may be a factor in the trial. See Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). The extent of the federal rule is unclear. Some circuits have applied what amounts to a per se rule that a racial prejudice question must be put to the venire in all cases where the defendant is a member of a minority group. See, e. g., United States v. Bowles, 574 F.2d 970 (8th Cir. 1978); United States v. Bell, 573 F.2d 1040 (8th Cir. 1978); United States v. Robinson, 485 F.2d 1157 (3d Cir. 1973). Our circuit, however, has declined to impose such a voir dire requirement upon district courts absent some indication that prejudice is likely to arise, or that the trial will have racial overtones. See United States v. Perez-Martinez, 525 F.2d 365 (9th Cir. 1975); United States v. Walker, 491 F.2d 236 (9th Cir.), cert. denied, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 768 (1974).

Under the principle of stare decisis, we are constrained to follow our holding in Perez-Martinez, supra, unless a subsequent decision of this court or of the United States Supreme Court has altered its basic principle. The Supreme Court addressed the question after our decision in Perez-

Martinez in Ristaino v. Ross, supra, a state prosecution of a black defendant charged with an assault upon a white security guard. In determining that there is no constitutional compulsion upon state courts to inquire into racial prejudice on voir dire, the Court noted that the duty imposed upon federal courts under the Court's supervisory power is much broader:

"Although we hold that voir dire questioning directed to racial prejudice was not constitutionally required, the wiser course generally is to identify racial prejudice if required by the defendant. Under our supervisory power we would have required as much of a federal court faced with the circumstances here."

424 U.S. at 597 n.9, 96 S.Ct. at 1022 n.9.

We do not find that Ristaino's cryptic reference to the federal rule requires that we disregard Perez-Martinez. While the Court found that there was not a "significant likelihood that racial prejudice might infect Ross' trial," 424 U.S. at 598, 96 S.Ct. at 1022, we note that the facts of Ristaino presented a greater likelihood of prejudice than do the facts of the present case. At least one other circuit has arrived at a similar conclusion in its interpretation of Ristaino. See United States v. Polk, 550 F.2d 1265 (10th Cir.), cert. denied, 434 U.S. 838, 98 S.Ct. 129, 54 L.Ed.2d 100 (1977). Accordingly, we hold that the Mexican heritage of Rosales-Lopez did not, in and of itself, require the court below to pose a question on racial prejudice to the venire.

■ We also find no circumstances in the record indicating that racial prejudice was likely to arise at trial. Perhaps the greatest potential for prejudice arose from the charge of harboring and transporting illegal aliens in a locality where the problem of illegal alien entry is a particularly sensitive issue. The trial judge, however, inquired into the feelings of the jurors on the illegal

2. The question as submitted read:

"7. Would you consider the race or Mexican descent of Humberto Rosales-Lopez in your evaluation of this case? How would it affect you?

alien problem, and two jurors were excused on that basis. We find that the voir dire in this case adequately probed the venire for potential bias on all issues.

## IV. *TRANSCRIPT OF SUPPRESSION HEARING*

In the course of his pre-trial motions, Rosales-Lopez moved to suppress certain evidence, and Judge Thompson conducted an evidentiary hearing on February 5, 1979. At the close of the hearing, counsel for Rosales-Lopez moved to obtain a copy of the hearing transcript at government expense on the ground that his client was indigent. Judge Thompson denied the motion to provide the transcript and, though the record here is ambiguous,[3] apparently referred the matter to the magistrate. On February 13, Magistrate Infante granted the motion to produce the transcript and signed a standard CJA Form 21 voucher. On February 21, however, Judge Thompson issued a memorandum denying defense counsel's request for the transcript, citing the failure to demonstrate any "particularized need" for it. Judge Corcoran, to whom the case was assigned for trial, refused to overrule Judge Thompson on the transcript question.

Rosales-Lopez asserts that the allegedly irregular method of reviewing the magistrate's ruling requires reversal, and raises both constitutional and statutory issues on the denial of the transcript. Because we find that the denial of the transcript was harmless beyond a reasonable doubt, we find it unnecessary to address the procedural question raised by Rosales-Lopez.

[redacted] While we are convinced that Rosales-Lopez was not prejudiced by the government's failure to provide him with a transcript, we feel some comments on the issue of providing trial aids to indigents are in order. The duty of the government to provide an indigent criminal defendant with the essential tools of trial defense is of both a constitutional and statutory dimension. *See generally Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); 18 U.S.C. § 3006A. Under certain circumstances, a transcript of a prior proceeding related to a criminal prosecution may be an item which the government is required to furnish to the indigent. *See Britt v. North Carolina, supra; Roberts v. LaVallee*, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967). Where a mistrial has occurred, courts have generally regarded a transcript of the prior trial as a tool "reasonably necessary" to an effective defense and have deemed it error to refuse to provide the defendant with such a transcript, provided that a timely request is made for its production. *See, e. g., United States v. Johnson*, 584 F.2d 148 (6th Cir. 1978), *cert. denied sub nom., Monger v. United States*, 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979); *United States v. Jonas*, 540 F.2d 566 (7th Cir. 1976); *United States v. Baker*, 523 F.2d 741 (5th Cir. 1975); *United States v. Acosta*, 495 F.2d 60 (10th Cir. 1974); *United*

3. The following exchange took place between defense counsel and Judge Thompson at the close of the hearing:

"Mr. Cleary: The reason I mentioned that was there is some indication, and I didn't raise those points here, concerning certain aspects of conduct, and at least the stated intention of the government to seek reindictment in this because of some of the defects in my pleadings. The one thing I would like to preserve at this time is a motion at this time for a transcript of these proceedings so that in the event of trial, which is now anticipated, I would have the opportunity for effective cross-examination—I only have my seven pages of notes—which is in *Britt v. North Carolina*, the requirement of keeping adequate notes to effectively cross-examine and confront what I assume will be two adverse witnesses at the time of trial.

"The Court: Those matters and matters of discovery, I'm not going to order any transcript relative to this hearing at all.

"Mr. Cleary: Could I ask that rather than dismissing my motions that my motions be transferred to the magistrate?

"The Court: No. It's improperly brought in this court according to local rules, so it would be dismissed without prejudice, which means you can bring it again." R.T. 92–93.

States v. Young, 472 F.2d 628 (6th Cir. 1972); United States ex rel. Wilson v. McMann, 408 F.2d 896 (2d Cir. 1969); Peterson v. United States, 351 F.2d 606 (9th Cir. 1965); But see United States v. Brown, 443 F.2d 659, 143 U.S.App.D.C. 244 (D.C.Cir. 1970); Forsberg v. United States, 351 F.2d 242 (9th Cir. 1965).

Where, however, the indigent defendant requests a transcript of a preliminary proceeding, courts have been less willing to find error in the failure to so provide. In Roberts v. LaVallee, supra, the Supreme Court struck down per curiam on equal protection grounds a New York statute which required all criminal defendants to pay five cents for every hundred words of requested transcripts of preliminary proceedings. The Court, however, did not address the limits of the indigent's right to a free transcript in such cases. Circuit courts considering the issue have generally shown a greater inclination to examine the actual prejudice to the defendant resulting from the denial of a transcript of a preliminary hearing than has been shown in cases involving the denial of a trial transcript. In United States ex rel. Moore v. People of the State of Illinois, 577 F.2d 411 (7th Cir. 1978), cert. denied, 440 U.S. 919, 99 S.Ct. 1242, 59 L.Ed.2d 471 (1979), the court found error in the failure to provide a transcript of a preliminary hearing at which an allegedly suggestive confrontation took place between the defendant and a rape victim, but held the error to be harmless beyond a reasonable doubt. In United States ex rel. Cadogan v. LaVallee, 428 F.2d 165 (2d Cir. 1970), cert. denied, 401 U.S. 914, 91 S.Ct. 887, 27 L.Ed.2d 813 (1971), failure to provide a transcript of a suppression hearing

was held to be not prejudicial where alleged discrepancies between testimony given at the hearing and at trial were "trivial."

While the standard of reasonable necessity in the area of free transcripts remains imprecise, the court below applied a standard which we find to be incorrect. The Supreme Court in Britt v. North Carolina, supra, ruled out "particularized need" as the applicable test for necessity. See 404 U.S. at 228, 92 S.Ct. at 434. We find, however, that the application of an erroneous legal standard in this case was harmless beyond a reasonable doubt. Rosales-Lopez claims prejudice in that two Immigration Service agents gave testimony at the suppression hearing which would have been useful in impeaching their testimony at trial. The defense, however, can point to only two minor inconsistencies between the testimony at the suppression hearing and the testimony given at trial.[4] Given the overall strong consistency between the lengthy testimony given by the witness at the hearing and the trial, we find beyond a reasonable doubt that the lack of a copy of the suppression hearing transcript did not prejudice the ability of the defense to cross-examine effectively and thereby present an adequate defense at trial.

## V. SENTENCING PROCEDURE

Rosales-Lopez claims that he was improperly sentenced by Judge Thompson, who had not presided at trial. Judge Corcoran, a visiting judge who sat in the district by designation, had presided at the trial but had returned to his home district prior to sentencing.

---

4. At the suppression hearing, Investigator Sanders testified that after the Oldsmobile arrived at the Los Angeles address, he made the following observation: ". . . I saw three people get out of the trunk of the Oldsmobile and go up the stairs to the second story apartment, with Humberto Rosales and the unknown Latin behind him." (R.T. 42) At trial, Investigator Sanders testified that Rosales-Lopez and the unknown male 'hurried' the aliens up the stairs." (R.T. 196).

A second alleged inconsistency arose where, at the suppression hearing, Investigator Sanders described the driver of the Oldsmobile as ". . . a male Latin, with short, black hair. I believe he was wearing sunglasses, probably about 25 to 30 years old, maybe." (R.T. 73) At trial, Sanders described the driver as having "some kind of glasses," and described his age as "around 30." (R.T. 212).

Fed.R.Crim.Proc. 25(b) allows for a district judge who did not preside at trial to pass sentence where the presiding judge is unable to do so by reason of "absence, death, sickness or other disability." The procedure under Rule 25(b) is proper where the sentencing judge is familiar with the case, and uses informed discretion in passing sentence. *United States v. Ortiz*, 603 F.2d 76, 81 (9th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980). In this case, Judge Thompson had presided over certain pre-trial matters, and had studied the presentencing report. The sentence itself reflects an informed discretion since the consecutive sentences on six of the counts were suspended. The passing of sentence by Judge Thompson was not error.

## VI. *PROSECUTORIAL VINDICTIVENESS*

Rosales-Lopez moved for dismissal below on the ground of vindictive prosecution, and for an evidentiary hearing relating to the dismissal motion. The court denied both motions.

The basis of the dismissal motion was that other members of the alien smuggling ring were allowed to plead to lesser misdemeanor counts and placed on probation. Rosales-Lopez maintains that his prosecution on felony counts was in response to his insistence on a jury trial, and that he was thereby "penalized" for exercising a constitutional right.

A defendant's right to due process of law is violated where the prosecution increases the severity of alleged charges in response to the exercise of a constitutional or statutory right. *See generally Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *United States v. Ruesga-Martinez*, 534 F.2d 1367 (9th Cir. 1976). Vindictiveness is normally found where the government has occasion to re-indict or re-

try a defendant following the exercise of a procedural right. *See United States v. Ruesga-Martinez, supra*, at 1369. Our circuit has refused to find the action of the prosecutor in reindicting a defendant vindictive where the charges contained in the second indictment expose the defendant to no greater risk of punishment than did those contained in the first indictment. *See United States v. Snell*, 592 F.2d 1083 (9th Cir.), *cert. denied*, 442 U.S. ——, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

In the present case, Rosales-Lopez has not faced any increased risk of punishment in response to the exercise of his rights. If anything, his risk of punishment was lessened by the superseding indictment, which dropped a number of the original counts. The court below did not err in refusing to dismiss on the basis of vindictive prosecution.

## VII. *INSTRUCTION ON LESSER INCLUDED OFFENSE*

Rosales-Lopez requested, but did not receive, an instruction on the lesser-included offense of aiding and abetting the illegal entry of an alien under 8 U.S.C. § 1325 and 18 U.S.C. § 2. He argues that 8 U.S.C. § 1324(a)(1) contains an element of knowledge that the alien entered the United States within the past three years, which is in addition to the elements of aiding and abetting entry under § 1325.

We cannot agree that § 1325 is properly chargeable as a lesser included offense. An element of the charge of aiding and abetting any offense under 18 U.S.C. § 2 is guilty knowledge. In this regard, we cannot find that § 1324 imposes an additional element in the government's burden of proof. *Cf. United States v. Wishart*, 582 F.2d 236 (2d Cir.), *cert. denied*, 439 U.S. 987, 99 S.Ct. 582, 58 L.Ed.2d 660 (1978); *United States v. Madden*, 525 F.2d 972 (5th Cir. 1976).

## VIII. *CONSECUTIVE SENTENCES*

Rosales-Lopez contends that the imposition of consecutive sentences for conviction

on counts of conspiracy, aiding and abetting the illegal transportation of aliens, and concealing, harboring and shielding illegal aliens constitutes an unreasonably pyramiding of punishment in contravention of the intent of Congress in enacting the statutory scheme dealing with illegal aliens.

■ The imposition of consecutive sentences on separate counts is improper where the separate offenses encompass successive steps or grades which normally flow into the same criminal act. *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1109 (9th Cir. 1979). An example of an instance where separate offenses flow into the same criminal act is an indictment for illegal entry by alien, 8 U.S.C. § 1325, and illegal re-entry of a deported alien, 8 U.S.C. § 1326, where the alien is charged with violating both statutes by a single act of entry. *United States v. Ortiz-Martinez*, 557 F.2d 214 (9th Cir. 1977).

■ The offenses with which Rosales-Lopez was charged do not constitute a single criminal act. The evidence adduced at trial revealed that Rosales-Lopez had engaged in some advance planning with other members of the smuggling ring, had sheltered the aliens at the Bowling residence, and had been clearly involved in the transportation of the aliens from Imperial Beach to Los Angeles. While it may not be unusual for these acts to occur in close relation to each other, each constitutes a separate danger to the public interest in preventing the entry of illegal aliens, and it is reasonable to find that Congress intended for each to be punished separately. No error was committed in the imposition of consecutive sentences.

## IX. *EQUAL PROTECTION*

■ 8 U.S.C. § 1324 contains a specific exemption proclaiming that employment of aliens shall not constitute "harboring." Rosales-Lopez claims that this exemption violates equal protection, and that his prosecution under the section was, therefore, illegal. Contrary to the assertion of defense counsel, we adequately disposed of this argument in *United States v. Acosta de Evans*, 531 F.2d 428 (9th Cir.), *cert. denied*, 429 U.S. 836, 97 S.Ct. 103, 50 L.Ed.2d 101 (1976). That decision is controlling. Rosales-Lopez was not denied equal protection of the laws.

## X. *CONCLUSION*

The judgment of the court below, and the imposition of sentences are

AFFIRMED.