# UNITED STATES of America, Plaintiff–Appellee,

v.

Jose Jorge ZAMORA–HERNANDEZ, Defendant–Appellant.

No. 99–50068.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1999

Filed Aug. 2, 2000

Matthew C. Winter, San Diego, California, for the defendant-appellant.

Michael P. Skerlos, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: D.W. NELSON, BEEZER and T.G. NELSON, Circuit Judges.

Opinion by Judge BEEZER; Dissent by Judge D.W. NELSON.

BEEZER, Circuit Judge:

Jose Jorge Zamora–Hernandez appeals his jury conviction and sentence for transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). He contends

that the district court erred in denying his motion to continue his retrial so that he could obtain a transcript of his first trial. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I

On March 23, 1998, on Interstate Eight outside of San Diego, two Border Patrol Agents pursued a U–Haul–franchised moving van ("rental truck") that the agents believed contained illegal aliens. Agents Kartchner and Martinez pulled alongside the vehicle for approximately 30 seconds, and during that time they observed two occupants in the front passenger section of the rental truck. When the truck eventually stopped, three people exited from the front passenger side of the vehicle and ran away from the agents. Two of the three occupants were apprehended. The agents identified one of them, Zamora–Hernandez, as the driver of the rental truck which also was found to contain 38 illegal aliens. Zamora–Hernandez was subsequently indicted on two counts of transporting illegal aliens in violation of section 1324(a)(1)(A)(ii).

On July 21, 1998, Zamora–Hernandez' first jury trial commenced. Agent Kartchner, the driver of the border patrol vehicle, identified Zamora–Hernandez as the driver of the rental truck. Agent Kartchner testified that he intermittently studied the profiles of the driver and passenger for approximately 30 seconds, while traveling 55 to 60 miles per hour alongside the rental truck, so that he would be able to identify the occupants when the truck was pulled over. Agent Kartchner recalled that the driver and passenger were wearing jackets. Agent Kartchner stated that once the rental truck had stopped, three passengers exited from the passenger-side door; he recognized only the first and last, both of whom were wearing jackets. He identified Zamora–Hernandez as the third

person to exit the truck and the first one that he apprehended. According to Agent Kartchner's testimony, Zamora–Hernandez' clothes were cleaner and drier than the clothes of the passengers in the back of the truck. On redirect, Agent Kartchner distinguished Zamora–Hernandez from the other recognized front-seat passenger by noting that Zamora–Hernandez "had probably three or four days worth of beard growth. The other individual did not. The other individual also had a flat top style haircut."[1]

Agent Martinez, the passenger in the border patrol vehicle, also identified Zamora–Hernandez as the driver of the rental truck based on observations during the approximately 30–second period in which the two vehicles were traveling side by side. Agent Martinez testified that he also saw the driver through the rearview mirror of the truck "flagging his hands around." Agent Martinez corroborated the following facts: 1) the driver and passenger were wearing jackets; 2) three people exited the rental truck from the passenger-side door; 3) the first person to exit was the previously observed passenger and the third person was the driver; and 4) he identified the driver as Zamora–Hernandez. Agent Martinez testified that he focused predominately on the hair and the eyes of the two men in making his identification and he was able to distinguish the passenger and the driver because the former's "hair was slightly lighter and he was younger." As compared to the aliens in the back of the truck, Agent Martinez stated that the driver and passenger "were clean. Their clothes were clean and their pants were still dry. No dirt on their shoes and no mud, very neat and ke[m]pt appearances."

Zamora–Hernandez denied driving the truck and testified that he did not know how to drive. In his defense, Zamora–

---

**1.** The dissent notes that Agent Kartchner's report does not mention that the driver and passenger were wearing jackets. The dissent also highlights that the report indicates that the agents traveled alongside the rental truck for 300 yards, rather than the approximately 800 yards suggested by Agent Kartchner's testimony. These facts were brought out on cross-examination and are irrelevant to the issue on appeal.

Hernandez testified that he was himself an illegal alien and not an alien smuggler. He stated that he was one of 39 illegal aliens who walked eight to ten hours through muddy hills over the border. Once across, the group waited for a rental truck to transport them further into the United States. When the vehicle arrived, the aliens were directed to climb into the back of the truck. Zamora–Hernandez attempted to get into the rear of the truck, but was pulled down by his backpack and instructed to enter the cabin of the rental truck. Inside the front section of the truck, he was joined by the driver and another passenger. Zamora–Hernandez was instructed to lie down on the floor of the vehicle so that only the driver and other passenger would be visible to onlookers. When the border patrol pulled over the rental truck, Zamora–Hernandez followed the other passenger out of the truck and fled with him before being apprehended by Agent Kartchner.

At the close of the two-day trial, the case was submitted to the jury. The jury deadlocked, and at 4:15 p.m. on Wednesday, July 22, 1998, the court declared a mistrial. Retrial was set for the following day. That evening, Zamora–Hernandez' counsel contacted the government to inform them that he would be seeking a continuance for the purpose of obtaining a transcript of the mistrial. Defense counsel also dispatched a runner to deliver the motion to the court. The next morning the court denied the motion.

The second trial commenced immediately thereafter, as scheduled. The government presented its entire case that Thursday. Agent Kartchner testified much as he had two days prior, identifying Zamora–Hernandez as the driver of the rental truck. He was then excused.[2] Agent Martinez also repeated his identification of Zamora–Hernandez as the driver. On cross-examination, Agent Martinez recalled his observation of Zamora–Hernandez through the rearview mirror of the rental truck. He stated that Zamora–Hernandez was "motioning with his hands" by waving one hand at a time.

The defense called two witnesses, including Zamora–Hernandez, that Thursday after which the court continued the case until Tuesday morning to enable Zamora–Hernandez' aunt to travel to court to testify as a character witness.[3] Prior to recess, the court instructed the jury, as it had at the outset of the trial, not to "discuss the case among yourselves or anyone else and [not to] form or reach an opinion regarding the case until it's finally submitted to you."

On Friday, Zamora–Hernandez subpoenaed Agent Martinez to return to court on Tuesday. On Monday, defense counsel obtained the agent's testimony from the first trial, as well as his testimony in the second trial.[4] On Tuesday, the second day of trial, Zamora–Hernandez recalled Agent Martinez to the stand to highlight inconsistencies in the agent's testimony between the two trials. First, Agent Martinez ac-

---

**2.** Following Agent Kartchner's testimony on redirect, the following exchange occurred:

The Court: "Can this witness be excused?"
Defense Counsel: "Yes, your Honor."
Government Counsel: "Yes, your Honor."
The Court: "You [Agent Kartchner] are excused."

Reporter's Transcript, vol. II, p. 89. That defense counsel later questioned whether Agent Kartchner had been excused is irrelevant. In any event, the record is void of evidence that Zamora–Hernandez' counsel ever sought to recall the agent. At oral argument, counsel expressly stated that he found Agent Kartchner's testimony to be consistent between the two trials and that the transcript of his testimony was not at issue on appeal.

**3.** Zamora–Hernandez' aunt was unable to testify on Tuesday because she and her child were ill. The parties stipulated that had she been present she would have testified that Zamora–Hernandez has a reputation of being a good person and that he has never driven a car and does not know how to drive.

**4.** Although Zamora–Hernandez' counsel had ordered the complete transcript on Thursday, time constraints on the court reporter limited what counsel was able to obtain. Following Agent Martinez' testimony on Thursday, defense counsel specifically requested Agent Martinez' testimony from the first trial.

knowledged that he had previously testified that the shoes Zamora–Hernandez wore when he was arrested were not dirty or muddy. When presented with the shoes on Tuesday, he noted that they had dirt on them. Second, the agent recalled testifying during the second trial that Zamora–Hernandez had waved one hand at a time while driving the rental truck. Defense counsel attempted to impeach Agent Martinez with his testimony from the first trial that the driver "started flagging his hands around" and "was waving his hands around." (emphasis added).

The jury convicted Zamora–Hernandez of transporting illegal aliens. On December 14, 1998, the court sentenced him to 15 months in prison and three years supervised release. Zamora–Hernandez timely appealed.

## II

■ The principal issue on appeal is whether Zamora–Hernandez was prejudiced by the district court's denial of a continuance. We review the district court's decision for an abuse of discretion. *See United States v. Garrett*, 179 F.3d 1143, 1144–45 (9th Cir.1999) (en banc). Four factors guide our case-specific review: 1) Zamora–Hernandez' diligence in preparing his defense prior to the trial date; 2) whether the continuance would have satisfied his needs; 3) the inconvenience a continuance would have caused the court and the government; and 4) "the extent to which [Zamora–Hernandez] might have suffered harm as a result of the district court's denial." *United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir.), *amended by* 764 F.2d 675 (9th Cir.1985).

The fourth factor is most critical. *See United States v. Mejia*, 69 F.3d 309, 316 (9th Cir.1995). Assuming without deciding that the other three factors weigh in Za-

mora–Hernandez' favor, to prevail he must still demonstrate "at a minimum that he has suffered prejudice as a result of the denial of his request." *Flynt*, 756 F.2d at 1359. Zamora–Hernandez fails to make such a showing. In drawing this conclusion, we focus on "the extent to which [Zamora–Hernandez'] right to present his defense has been affected." *Mejia*, 69 F.3d at 318 n.11.

■ The district court's denial of the continuance prevented Zamora–Hernandez from obtaining a complete transcript of his first trial prior to the commencement of his second trial. At oral argument, Zamora–Hernandez conceded that a subsequent review of the entire transcript indicated that only Agent Martinez' testimony had changed between the two trials. Zamora–Hernandez was able to secure this testimony by Monday, however, and used it to impeach Agent Martinez on the second day of the retrial.

Zamora–Hernandez argues that the delay in obtaining Agent Martinez' testimony prejudiced him because: 1) it prevented his counsel from adequately preparing to cross-examine Agent Martinez on the first day of the retrial; and 2) it provided the jury with five days to consider Agent Martinez' insufficiently challenged testimony.[5] Neither of these arguments establish that Zamora–Hernandez' right to present his defense was adversely affected.

Zamora–Hernandez was able to remedy any deficiency in Agent Martinez' cross-examination when he recalled the agent on the second day of trial. Indeed, the delay possibly aided Zamora–Hernandez because he was able to compare written transcripts of Agent Martinez' testimony from both trials before questioning him on Tuesday. Any inconsistencies in Agent Martinez'

---

5. Zamora–Hernandez does not argue that an incomplete transcript prevented him from using Agent Kartchner's testimony from the first trial to impeach that of Agent Martinez in the second trial. Nor does Zamora–Hernandez contend that the lack of the complete transcript interfered with the preparation of his

own testimony for the second trial. Zamora–Hernandez' testimony was consistent from the first to the second trial; the dissent's suggestion that he would have appeared more credible during retrial had he been able to review his prior testimony is purely speculative.

testimony between the two trials would presumably be clearer after comparing the written transcripts from both proceedings than after comparing the written transcript of the first trial with the agent's live testimony in the second.

■ Zamora–Hernandez' second argument, that the jury was permitted to consider Agent Martinez' insufficiently challenged testimony for five days, is similarly without merit. It is not uncommon for the trial court to recess before cross-examination is completed or before one side has presented any evidence. In such circumstances, the jury is reminded to keep an open mind and to refrain from evaluating the evidence or credibility of the witnesses until the case is finally submitted. The jury in this case was specifically instructed to this effect, and we presume that the jurors followed the court's instructions. *See Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

The delay in receiving the transcript of Agent Martinez' testimony in the first trial did not prevent Zamora–Hernandez from presenting any evidence in his defense. *See Mejia*, 69 F.3d at 317. Only the timing was affected. Before recess on Thursday, the court specifically instructed the jury to refrain from forming any opinion on the case. Zamora–Hernandez cannot demonstrate any prejudice from the denial of his request for a continuance.

The district court did not abuse its discretion in denying the continuance.

AFFIRMED.

D.W. NELSON, Circuit Judge, Dissenting:

This case demonstrates the importance of safeguarding a defendant's right to a complete transcript prior to a second trial. There was an indigent defendant, a green federal public defender, an overburdened district judge, and a weak case that hinged on two brief eyewitness identifications. The district court abused its discretion in denying Zamora–Hernandez' pre-trial request for a continuance in order to obtain a complete transcript of the first trial. Without a complete transcript, Zamora–Hernandez was unable to prepare for the second trial and to impeach the credibility of the government's eyewitnesses based on their prior testimony. Not having a complete transcript of the first trial was akin to not having a lawyer at the second one. I respectfully dissent.

## I. FACTUAL BACKGROUND

I will briefly review a few of the facts, most of which are not contained in the majority opinion. The government's case rests on the credibility of two Border Patrol agents who identified Zamora–Hernandez as the driver of a truck containing illegal aliens. What surprised the agents was that three people jumped out of the front section of the U–Haul truck when there appeared to be only two people in the front section. One of the three people escaped. The second person was inexplicably deported before the first trial. The third person, Zamora–Hernandez, insisted that he was not the driver of the truck.

### A. First Trial

At the first trial, both agents identified Zamora–Hernandez as the driver of the truck. Their eyewitness identifications are based on a 30–second interval (Agent Kartchner's original report described the interval as 300 yards)[1] in which the border patrol agents were driving alongside the U–Haul at 55 to 60 miles per hour.

Agent Kartchner was the driver of the border patrol vehicle, yet he was able to

---

1. Although the majority opinion claims that the facts not included in Agent Kartchner's report are irrelevant because they were brought out on cross-examination at the first trial, the majority misses the point. The disparities between Agent Kartchner's report and his testimony at the first trial emphasize the importance of having a complete transcript before the second trial so that Agent Kartchner could not further deviate from his report at the second trial and so that these disparities are once again highlighted for the second jury.

give the most detailed physical descriptions based on the profiles of the driver and only visible passenger. Agent Kartchner testified that both the driver and the visible passenger were wearing jackets (another fact not included in Agent Kartchner's original report). Finally, after a lengthy cross-examination, Agent Kartchner said on redirect that he identified Zamora–Hernandez as the driver because: "The defendant at that time had probably three or four days worth of beard growth. The other individual did not. The other individual [the only visible passenger] had a flat top styled haircut."

Agent Martinez, the passenger in the border patrol vehicle, had a closer, unimpeded view of the driver. Yet Agent Martinez' testimony about the identity of the driver was less detailed. Although Agent Martinez corroborated that the driver and the visible passenger were wearing jackets, Agent Martinez never testified that the driver had a beard. When asked to describe the differences between the passenger and the driver of the U–Haul, Agent Martinez said: "The passenger had—his hair was slightly lighter and he was younger, more of a younger appearance." When asked about differences regarding their clothing and features, Agent Martinez said: "Just basically the hair and the eyes." This description was based on the driver's profile. Agent Martinez also testified that he "looked directly at the driver" through the U–Haul's rear view mirror when the border patrol vehicle was directly behind the U–Haul. Agent Martinez said the driver "started flagging his hands around and seemed to be talking." On cross-examination, Agent Martinez said that the driver was "turned towards . . . the passenger and waving his arms around."

Zamora–Hernandez testified that he did not know how to drive, that he was instructed to lie on the floor of the U–Haul truck, and that he was among the illegal aliens being smuggled over the border. Based on this evidence, the jury could not

reach a verdict. The district court declared a mistrial. The federal public defender (FPD) asked for a one or two day continuance in order to secure a witness. The district court ordered the retrial to begin the following day.

### B. The Transcript Request

When he returned to his office that afternoon, the FPD realized that Zamora–Hernandez was entitled to a complete transcript of the mistrial. It was only the third case that the FPD had ever tried before a jury.[2] That evening, on July 22, 1998, the FPD called the government's attorneys to inform them that Zamora–Hernandez would be seeking a continuance in order to secure a complete transcript of the mistrial. The FPD also had a runner take the motion over to the district court. At 9 a.m. on July 23, 1998, after a brief oral argument, the district court denied Zamora–Hernandez' request for a complete transcript based on the following reasons:

(1) "[D]efense agreed to the trial starting today";

(2) "[T]here were no timely requests for the—in fact, I got the motion 20 minutes ago";

(3) Thirty-five potential members of the jury had been impaneled, costing the government $40 per person;

(4) One of the border patrol agents is training in South Carolina—"He would have to travel back and forth."; and

(5) "[A]s a convenience to counsel to have this case tried as you agreed, I have arranged with a visiting judge to take another case that was supposed to start trying next week, a case involving Ms. Franco of your office."

The district court rejected the FPD's request to petition for a writ of mandamus: "No. Denied. You can file your Writ anytime this morning, if they want to stop me—there is a trial coming on. I am not going to hold up all of these jurors." Dur-

---

**2.** The FPD testified to this fact at oral argument.

ing this colloquy, the district court told the FPD: "If there is any testimony that you feel is necessary that comes up today that you can ask the court reporter to attempt—I can't promise you it will be done, but to have it available by Tuesday to use." The FPD immediately ordered a complete transcript of the first trial.

### C. The Second Trial

At the second trial, Agents Kartchner and Martinez once again identified Zamora–Hernandez as the driver. This time, however, Agent Kartchner testified on direct examination about the driver's physical appearance in greater detail. Agent Kartchner said: "I noticed specifically that the driver had what appeared to be about a week or two weeks' worth possibly of a beard growth. He had a mustache."

Agent Martinez did not testify about seeing the driver with a beard, mustache, or any facial hair. When asked how he recognized the driver as he exited the U–Haul, Agent Martinez said: "His hair and the article of clothing he was wearing." When asked again how he recognized Zamora–Hernandez as the driver, Agent Martinez said: "Facial features and upper clothing that he was wearing."

Zamora–Hernandez once again testified that he did not know how to drive and that he was not the driver of the U–Haul. Zamora–Hernandez said that his cousin had arranged the passage through the hills, but added that his brother was going to pay the smugglers. The prosecutor repeatedly asked Zamora–Hernandez whether he was second or third person out of the front of the U Haul. Zamora–Hernandez said: "I got out right behind the passenger, and I don't know at what moment the driver got out, nor from where." Finally, Zamora–Hernandez said he did not know if

he was the second person or the third person out of the truck, because he did not know when the driver got out.

The government rested its case at the end of the first day of the second trial. The second trial resumed five days later. By that time, Zamora–Hernandez had received a transcript of only Agent Martinez' testimony. Zamora–Hernandez recalled Agent Martinez, who admitted that there was mud and dirt on Zamora–Hernandez' shoes (suggesting that Zamora–Hernandez had traveled through the hills) and that he had testified that the alleged driver was simultaneously waving his hands (instead of having them on the steering wheel). Agent Kartchner, who gave the most detailed description of the driver, was in South Carolina and could not have been recalled.[3] Nor did the FPD have the transcript of Agent Kartchner's prior testimony. After brief closing arguments, the jury convicted Zamora–Hernandez of transporting the illegal aliens.

## II. DENIAL OF CONTINUANCE

### A. The District Court's Reasons

None of the district court's reasons for denying Zamora–Hernandez' pre-trial request for a continuance justifies sacrificing his right to a complete transcript.

First, the district court said the FPD agreed to start the trial the next day. That is factually incorrect. Although it was in the context of securing a defense witness, the FPD specifically said, "I would need a day." Furthermore, any competent attorney would need at least a day to prepare for a retrial. We have found in the past that "[a] delay of one court-day is ordinarily not a 'cognizable

---

**3.** Although the record indicates that Agent Kartchner was excused after the first day of the second trial, the district court apparently changed its mind based on a subsequent colloquy. At the end of the first day of the second trial, the FPD said: "Your Honor, just one other thing. I don't believe Agent Kartchner was ever excused as a witness." The Court replied: "I don't believe he was."

This colloquy at least reopened the possibility of recalling Agent Kartchner. Whether Agent Kartchner was excused is relevant because (1) Zamora–Hernandez never received a complete transcript of Agent Kartchner's prior testimony; and (2) The complete transcript reveals that Agent Kartchner's in-court descriptions of the alleged driver varied significantly between the two trials.

inconvenience.'" *United States v. Mejia,* 69 F.3d 309, 316 (9th Cir.1995) (quoting *United States v. Flynt,* 756 F.2d 1352, 1360 (9th Cir.1985), *amended,* 764 F.2d 675).

Second, the district court said the request was untimely. This case, however, is not like other cases that have found motions for a transcript from a previous trial to be untimely. The request was not in the middle of the trial or during the cross-examination of a witness. *See United States v. Johnson,* 584 F.2d 148, 157 (6th Cir.1978) (rejecting the request during the cross-examination of a witness because "[t]he request for the transcript should have been made before trial or at least well before Taylor testified, absent some showing of good cause for delay"); *United States v. DeJarnette,* 429 F.2d 571, 572 (6th Cir.1970) (per curiam) (denying the request for a transcript because it was made in the middle of a retrial). In this case, there was not much time to request a complete transcript before the start of the second trial. On the evening after the mistrial, the FPD informed opposing counsel that Zamora–Hernandez was requesting a continuance in order to obtain a complete transcript. The FPD had a runner take the motion over to the district court. The FPD made his motion to the court before the start of the second trial. In requesting the transcript immediately before trial, the FPD did not deliberately intend to delay the second trial, nor was the FPD carelessly wasting the court's judicial resources. *Cf. United States v. Garrett,* 179 F.3d 1143, 1147 (9th Cir.1999) (en banc) (affirming the denial of a continuance because the district court believed that it was requested "for purpose of delay"). Given the compressed time frame in this case, I believe the FPD's request was timely and not for the purposes of delay.

Third, the district court said 35 potential members of the jury already had been impaneled at $40 each. This cost to the taxpayers, however, is de minimis compared to the cost of this appeal. This court has recognized that "denying a tran-script request can lead to lengthy appeals and reversals, wasting more government resources than it saves." *United States v. Devlin,* 13 F.3d 1361, 1364 (9th Cir.1994).

Fourth, the district court said that one of the agents would have to travel back and forth from South Carolina. That is factually incorrect. The agent was in California. The government, in arguing that the retrial should start immediately, said that Agent Kartchner was scheduled to return to South Carolina at the end of the week to conduct training. A continuance would not have forced Agent Kartchner to fly back and forth from South Carolina, it only would have forced him to stay in California for a few extra days.

Finally, the district court offhandedly mentioned it had "arranged with a visiting judge to take another case that was supposed to start trying next week, a case involving Ms. Franco of your office." The fact that an attorney from the federal public defender's office was involved in the other case has nothing to do with Zamora–Hernandez' right to a complete transcript. This is only a two-day trial. At most, a delayed retrial would have lasted into the middle of the following week. The impact of a one or two court-day continuance on the district court's caseload would have been minimal. In light of the defendant's pre-trial request for a complete transcript, I believe the district court's reasons for denying the continuance indicate an abuse of its discretion.

### B. *Prejudice*

The majority opinion's discussion of prejudice fails to acknowledge the defendant's right to a complete transcript before the second trial. This case shows why receiving a partial transcript in the middle of the trial is insufficient. Zamora–Hernandez suffered prejudice not only from the delay in receiving the transcripts of Agent Martinez' testimony, but also in not having the rest of the transcript as a source of comparison. Zamora–Hernandez was prejudiced by not having a complete transcript, and by not having it before trial.

### 1. *Standard of Prejudice*

Our case law has recognized that a lesser showing of prejudice is required when the denial of a continuance affects a defendant's ability to present an adequate defense:

> Where, as here, the denial of a continuance of the proceeding directly affects a defendant's ability to present evidence, we do not require "the clearest showing" of "actual and substantial prejudice." To the contrary, we have consistently applied the less stringent prejudice test articulated in *Flynt,* and have examined carefully the extent to which the aggrieved party's right to present his defense has been affected.

*Mejia,* 69 F.3d at 318 n.11. We have consistently found that a district court has abused its discretion when the denial of a continuance has affected the defendant's ability to present an adequate defense or has compromised his right to a fair trial. *See Flynt,* 756 F.2d at 1361 (finding prejudice because the district court refused to continue the hearing so that the appellant could obtain a psychiatric evaluation); *United States v. Pope,* 841 F.2d 954, 958 (9th Cir.1988) (finding prejudice where the denial of a brief continuance prevented the defendant from introducing "the only testimony that could plausibly have helped him"); *United States v. 2.61 Acres of Land,* 791 F.2d 666, 671 (9th Cir.1985) (finding prejudice where the denial of a continuance prevented the defendant from introducing any evidence on its behalf); *Armant v. Marquez,* 772 F.2d 552, 557 (9th Cir.1985) (finding prejudice where the denial of a continuance prevented the defendant from preparing his own defense).

### 2. *The Denial of a Complete Transcript*

The Supreme Court has found that "even in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses." *Britt v. North Carolina,* 404 U.S. 226, 228, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). The Court recently has reaffirmed the importance of providing transcripts of prior proceedings. *See M.L.B. v. S.L.J.,* 519 U.S. 102, 128, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (holding that an indigent mother had the right to a free transcript to appeal her parental termination case). Although these cases deal primarily with denying transcripts because of indigency, they define the constitutional right to a transcript.

The underlying constitutional right at stake is extremely important in considering whether the district court abused its discretion in denying a continuance. *Garrett,* a recent en banc decision, found that "[w]hen a motion for a continuance arguably implicates a defendant's Sixth Amendment right to counsel, the court must consider the effect of its decision on this fundamental right. A defendant's right to counsel is central to our system of justice." *Garrett,* 179 F.3d at 1147 (citing *Gideon v. Wainwright,* 372 U.S. 335, 340, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). The Supreme Court has recognized that "the right to counsel at state expense, as delineated by our decisions, is less encompassing" than the line of cases providing the right to a transcript. *M.L.B.,* 519 U.S. at 112–13, 117 S.Ct. at 562.

In this circuit, we have found that " 'where a mistrial has occurred, courts have generally regarded a transcript of the prior trial as a tool "reasonably necessary" to an effective defense and have deemed it error to refuse to provide the defendant with such a transcript.' " *Devlin,* 13 F.3d at 1364 (quoting *Rosales–Lopez,* 617 F.2d 1349, 1355 (9th Cir.1980) (citations omitted)).[4] Furthermore, *Devlin* said: "To be

---

4. *Devlin* omitted a clause at the end of that sentence in *Rosales–Lopez* that says, "provided that a timely request is made for its production." *Rosales–Lopez,* 617 F.2d at 1355.

As stated earlier, I believe that Zamora–Hernandez' pre-trial request for a complete transcript was timely.

most effective to [the defendant], the transcript should have been made available before the trial so that his counsel could prepare his strategy. The transcript's value is lost if Devlin's counsel must rely on his memory or notes." *Id.* Finally, *Devlin* found that a transcript of a prior mistrial is more important than a transcript of a preliminary proceeding, and it found actual prejudice because "[i]n cases whose outcome turns on witness credibility, the potential value of a transcript for impeachment purposes is obvious." *Id.* at 1365.

### 3. *Prejudice to Zamora–Hernandez*

The lack of a complete transcript before the second trial prejudiced Zamora–Hernandez in three principal ways: (1) he was unable to prepare adequately for the second trial; (2) he could not highlight disparities in the eyewitness identifications by Agents Kartchner and Martinez; and (3) he was unable to conduct a contemporaneous cross-examination of both agents, providing the government with "a free case in chief." While the majority opinion focuses on the least prejudicial third factor, it ignores the first two—to the detriment of Zamora–Hernandez' right to a fair trial.

### a. *Preparing For Trial*

Not having a complete transcript before the start of the second trial hindered Zamora–Hernandez' trial preparation. *See Devlin,* 13 F.3d at 1364 (finding that a complete transcript of a mistrial should be provided before the start of the second trial). A complete transcript of the mistrial would have revealed weaknesses in the prior testimony of Agent Kartchner and Agent Martinez that could have been exploited during Zamora–Hernandez' opening statement and on cross-examination. Agent Kartchner, who was driving the border patrol vehicle, gave a more detailed physical description of the driver of the U–Haul, claiming that the other driver had "probably three or four days worth of beard growth." Agent Kartchner also said that the visible passenger in the front of the U–Haul had a "flat top" haircut. Yet Agent Martinez, the passenger in the border patrol vehicle with a closer, unimpeded view of the U–Haul, gave a less detailed physical description. Agent Martinez said the passenger "had—his hair was slightly lighter and he was younger," and said the only differences between the passenger and the driver was "[j]ust basically the hair and the eyes." At the first trial, Agent Martinez said nothing about a flat-top haircut or a beard.

Not having a complete transcript also prevented Zamora–Hernandez from reviewing his own testimony from the first trial. Unlike Agent Kartchner and Agent Martinez, Zamora–Hernandez was not an experienced trial witness. At the second trial, the prosecutor was able to confuse Zamora–Hernandez by asking him about his brother-in-law (Zamora–Hernandez had only mentioned his cousin and added a detail about his brother), and by repeatedly asking Zamora–Hernandez whether he was the second or third person out of the truck. Although the prosecutor never revealed any glaring inconsistencies, Zamora–Hernandez would have appeared more credible at the second trial if he had reviewed a transcript of his prior testimony.[5]

### b. *The Credibility of the Government's Witnesses*

Not having a complete transcript prevented Zamora–Hernandez from attacking the credibility of the agents' eyewitness identifications at the second trial. The outcome of this case turned on the credibility of these identifications. *See Devlin,*

---

5. The record indicates that the prosecutor asked Zamora–Hernandez about a brother-in-law whom Zamora–Hernandez never mentioned, and about whether Zamora–Hernandez was the first or last person out of the truck. The prosecutor was trying to trip up Zamora–Hernandez. Given the persistent nature of the prosecutor's questions at the second trial, Zamora–Hernandez would have benefitted from reviewing his prior testimony. This is not, as the majority opinion suggests, "purely speculative." It is revealed by reviewing the record of the second trial.

13 F.3d at 1365 (finding actual prejudice by not having a transcript when the outcome turned on the credibility of the witnesses). Yet the only way Zamora–Hernandez' lawyer could have immediately identified inconsistencies in the second-trial testimony of either Agent Kartchner or Agent Martinez was with the aid of a complete transcript.

Zamora–Hernandez never received a transcript of Agent Kartchner's testimony. Agent Kartchner, the driver of the border patrol vehicle, was the government's star witness in that he gave the most detailed descriptions of the driver of the U–Haul. Agent Kartchner's testimony changed during the two trials. For example, Agent Kartchner testified at the first trial on redirect that the driver of the U–Haul "had probably three or four days worth of beard growth." At the second trial on direct examination, Agent Kartchner testified that the driver of the U–Haul "had what appeared to be a week or two weeks' worth possibly of beard growth. He had a mustache." Neither of these descriptions was in Agent Kartchner's original report. Zamora–Hernandez' FPD did not highlight these inconsistencies during the second trial.[6]

Zamora–Hernandez eventually received transcripts of Agent Martinez' testimony on the second day of the second trial, enabling him to recall Agent Martinez. Although the majority asserts that the five-day delay benefitted the FPD by allowing him to obtain both of Agent Martinez' transcripts, the FPD did not have the opportunity to compare Agent Martinez' prior testimony to Agent Kartchner's, which would have revealed their differing physical descriptions of the driver. Having transcripts of Agent Martinez' testimony, in the absence of the other agent's prior testimony, was insufficient to impeach even Agent Martinez.

### c. The Government's "Free Case in Chief"

Although Zamora–Hernandez received a partial transcript (only Agent Martinez' testimony) on the second day of the second trial, Zamora–Hernandez still suffered prejudice by not being able to conduct a thorough and contemporaneous cross-examination of the government's witnesses. Zamora–Hernandez had to wait five days before he could confront Agent Martinez with his prior testimony, and Zamora–Hernandez was not able to impeach Agent Kartchner at all. In effect, the government received a "free case in chief" on the first day of the second trial. The lack of a thorough cross-examination on that first day made the government's witnesses seem more credible than they actually were and made the government's case seem stronger than it actually was.

In focusing on this latter point, the majority opinion fails to acknowledge that not having a complete transcript prevented Zamora–Hernandez from attacking the

---

6. Although the FPD conceded in the heat of oral argument that Agent Kartchner's testimony at the first and second trials was "consistent," a complete transcript of Agent Kartchner's prior testimony reveals significant differences between Agent Kartchner's in-court identifications of the alleged driver. Agent Kartchner's inconsistent testimony merely underscores how not having a complete transcript prejudiced Zamora–Hernandez' right to a fair trial: (1) The FPD specifically said that not having a complete transcript prevented him from adequately preparing for the second trial. Part of this trial preparation would have included a thorough review of Agent Kartchner's prior testimony, which may have alerted the FPD to the deviations in Agent Kartchner's eyewitness identifications; (2) Even if the FPD had been aware of these inconsistencies, Agent Kartchner (although not technically excused, *see supra* note three) had returned to South Carolina after the first day of the second trial and could not have been recalled to the stand; (3) Not having a transcript of Agent Kartchner's prior testimony also handicapped the FPD in cross-examining Agent Martinez (i.e. why Agent Martinez' eyewitness identification was less detailed than Agent Kartchner's despite the fact that Agent Martinez had a clearer, uninterrupted view of the driver of the U–Haul).

heart of the government's case—the credibility of the agents' eyewitness identifications. Agent Martinez enjoyed a better view of the alleged driver, yet he gave a less detailed description. Agent Kartchner's description changed between the two trials (adding a longer beard and mustache), possibly indicating that he was identifying Zamora–Hernandez as the driver based on his in-court identifications of Zamora–Hernandez and not based on his high-speed viewing of the actual driver. A good lawyer with a complete transcript would have attacked the credibility of these eyewitness identifications based on their inconsistencies, differences, and plausibility. Given the centrality of these identifications to the government's case, I believe that Zamora–Hernandez suffered actual prejudice.

## III. CONCLUSION

Zamora–Hernandez' only defense in this case was that he was not the driver of the U–Haul truck. Not having a complete transcript of the first trial made it virtually impossible for Zamora–Hernandez to prepare adequately for the second trial and to attack the credibility of the government's eyewitness identifications. The wheels of justice were spinning too fast. The district court's denial of a continuance compromised Zamora–Hernandez' right to a fair to trial. The majority opinion ignores his right to a complete transcript. Therefore, I respectfully dissent.